IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


Civil No. 21-CV- 723

| | | |
|---|---|---|
| JAMES COLEMAN | ) | |
|     Plaintiff, | ) | |
| v. | ) | |
| UNIVERSITY OF NORTH CAROLINA AT GREENSBORO, Dr. FRANKLIN D. GILLIAM, JR., individually and in his official capacity, JULIA JACKSON-NEWSOM, individually and in her official capacity, | ) | **COMPLAINT** |
| | ) | (Jury Trial Demanded) |
| | ) | |
|     Defendants. | | |


Plaintiff Dr. James Coleman ("Dr. Coleman") through undersigned counsel, files

this Complaint against (1) The University of North Carolina at Greensboro (the

"University" or "UNCG"), Dr. Franklin D. Gilliam, Jr. ("Defendant Gilliam" or the

"Chancellor"), and Julia Jackson-Newsom ("Defendant Jackson-Newsom") in their

official capacities for violations of Title IX of the Education Amendments of 1972 ("Title

IX"), 20 U.S.C. § 1681(a); (2) Defendant Gilliam and Defendant Jackson-Newsom

individually and in their official capacities for violation of Dr. Coleman's constitutional

due process rights and for violation of Dr. Coleman's constitutional right to equal

protection, actionable pursuant to 42 U.S.C. § 1983; and (3) Defendant Gilliam

individually for obstruction of justice. In support Dr. Coleman alleges and says:

Case 1:21-cv-00723-CCE-LPA   Document 1   Filed 09/17/21   Page 1 of 100

# PARTIES

1. Plaintiff Dr. James Coleman ("Dr. Coleman") is a citizen and resident of North Carolina. At all times relevant to this action Dr. Coleman was employed by the University of North Carolina at Greensboro either as Provost or as a tenured professor in the biology department after Dr. Coleman's termination as Provost. Dr. Coleman has resided in Guilford County, North Carolina after his selection for the UNCG Provost position on 12 May 2020.

2. Defendant University of North Carolina at Greensboro ("UNCG") is one of the seventeen campuses of The University of North Carolina currently administered by President Peter Hans and overseen by the UNC Board of Governors and headed by its own Chancellor, Dr. Franklin D. Gilliam, Jr. and its own Board of Trustees, currently chaired by Betsy S. Oakley, located in Greensboro, North Carolina. Defendant UNCG receives federal financial assistance and is a public entity for the purposes of Title IX of the Higher Education Act of 1972.

3. Dr. Franklin D. Gilliam, Jr. ("Defendant Gilliam" or the "Chancellor") is Chancellor of UNCG and, as Chancellor, is "[t]he administrative and executive head of" UNCG who "shall exercise complete executive authority therein" and "shall be responsible for carrying out policies of the Board of Governors and of the board of trustees"[1] and who "shall be the leader of and the official spokesperson for the

---

[1] The UNC Policy Manual, *The Code*, Chapter V § 502D(1) ("*The UNC Code*"); *see also* N.C. Gen. Stat. 116-34(a).

Case 1:21-cv-00723-CCE-LPA   Document 1   Filed 09/17/21   Page 2 of 100

institution."[2] Defendant Gilliam is sued in his official capacity for violation of Dr. Coleman's statutory rights under Title IX; in his official and individual capacities for violation of Dr. Coleman's constitutional due process and equal protection rights under 42 U.S.C. § 1983; and in his individual capacity for obstruction of justice.

4.  Defendant Julia Jackson-Newsom ("Defendant Jackson-Newsom") was at all relevant times the Associate Vice Chancellor for Strategy and Policy at UNCG, was a member of the Chancellor's Council, and served as the UNCG Senior Title IX Administrator. Julia Jackson-Newsom is sued in her official capacity for violation of Dr. Coleman's statutory rights under Title IX; and in her official and individual capacities for violation of Dr. Coleman's due process and equal protection rights under 42 U.S.C. § 1983.

5.  All defendants in their actions set forth herein are alleged to have been acting under color of statutes, regulations, customs and usages of the state of North Carolina and defendants' actions as individuals taken under color of state law render them liable under 42 U.S.C. § 1983.

<strong>JURISDICTION AND VENUE</strong>

6.  This Court has subject-matter jurisdiction under 42 U.S.C. §§ 1983 and 1988, and under 28 U.S.C. § 1331 and § 1343(a)(3). This Court also has original jurisdiction under Title IX Education Amendment of 1972, 20 U.S.C. §§ 1681-1688, enforceable through

---

[2] *Id.*, § 502.D.

an implied private right of action for monetary damages and injunctive relief that encompasses employees and complaint respondents.[3]

7. Plaintiff also invokes this Court's jurisdiction over related state common law and statutory claims for obstruction of justice under the principles of pendent jurisdiction pursuant to 28 U.S.C. § 1367 because the state law and common law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

8. This Court has personal jurisdiction over defendants because all defendants are domiciled in the State of North Carolina.

9. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because UNCG is located and considered to reside in this judicial district and division. In addition, the events giving rise to Dr. Coleman's claims occurred within this judicial district and division.

## STATEMENT OF FACTS

### I. Underlying events

10. Dr. James Coleman graduated from the University of Maine with "highest distinction" and thereafter received his M.S., M.Phil, and Ph.D. from Yale University. Dr.

---

[3] *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 703 (1979); *North Haven Bd. Of Education v. Bell*, 456 U.S. at 520, 102 S.Ct. (1912); *see also Wilkerson v. University of North Texas*, 223 F. Supp. 3d 592 (E.D. Tex. 2016) (holding Title IX protects the subject of a sexual harassment claim); *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992) (holding monetary damages are available remedy in Title IX actions).

Coleman was a Postdoctoral scholar at Stanford University and a Postdoctoral Fellow at Harvard University.

11. In his career as a plant physiological ecologist, Dr. Coleman authored or co-authored eighty (80) published papers that have been cited over 8,000 times; Dr. Coleman is an elected Fellow of the American Association for the Advancement of Science.

12. Prior to being recruited by UNCG to serve as Provost and Executive Vice Chancellor, Dr. Coleman spent over 30 years of his life in higher education positions including research institutions across the United States as follows:

      a. Cary Fellow of the Yale University Graduate School and the Institute of Ecosystems Studies;

      b. Assistant and Associate Professor of Biology at Syracuse University;

      c. Program Officer for the Ecological and Evolutionary Physiology Program in the Division of Integrated Biology and Neuroscience at the National Science Foundation;

      d. Executive Director, Research Professor, Interim Vice President for Research and Business Development, Vice President for Research and Business Development, and Research Professor of Earth and Ecosystem Science at the Desert Research Institute;

e.   Project Director for the State of Nevada's multi-million-dollar National Science Foundation EPSCoR program, reporting to the Vice Chancellor for Academic Affairs at the University and Community College System of Nevada;

f.   Vice Chancellor for Research, Director of the Office of Research, and Professor of Biological Sciences at the University of Missouri, Columbia;

g.   Vice Provost for Research and Professor of Ecology and Evolutionary Biology at Rice University;

h.   Dean of the College of Humanities and Sciences and Professor of Biology at Virginia Commonwealth University;

i.   Provost and Vice President for Academic Affairs, and Professor of Biological Sciences at Northern Arizona University; and

j.   Provost, Executive Vice Chancellor for Academic Affairs, and Professor of Biological Sciences at the University of Arkansas.

A copy of Dr. Coleman's curriculum vitae is attached as Exhibit A.

13. On 12 May 2020 UNCG announced Dr. Coleman as the University's new Provost and Executive Vice Chancellor. The announcement included a quote by Defendant Gilliam expressing his confidence in Dr. Coleman's qualifications for the administrative position.[4]

14. After accepting the UNCG Provost position Dr. Coleman and his wife of twenty-two (22) years, Adele Coleman, moved with their two dogs to Greensboro, North Carolina from their home in Arkansas amidst the Covid-19 pandemic in the summer of 2020.

15. As UNCG Provost and executive Vice Chancellor for Academic Affairs, Dr. Coleman was responsible for in-person and online instruction, curricular development and student success, as well as working closely with faculty and staff in institutional efforts related to recruitment and retention of qualified faculty and developing UNCG's research, scholarship, and creative activity infrastructure. Dr. Coleman was also responsible for overseeing, supervising, and determining resource allocation for all UNCG curricular, instructional, and research activities.

16. Dr. Coleman's transition to North Carolina proved difficult because of the significant Covid-19 impact limiting social interactions and community activities.

17. In the Summer of 2020, Dr. Coleman's colleague(s) began organizing informal social gatherings to introduce Dr. Coleman and his wife to fellow community and university members. Dr. Coleman and Adele enjoyed these gatherings and the opportunity to become a part of the UNCG community.

---

[4] Dr. Coleman was contemporaneously hired under contract as a tenured professor in UNCG's biology department.

18. On 6 November 2020 Dr. Coleman and Adele attended a social gathering at Oden Brewing Company. At this event, they were approached by a UNCG professor, who will be referred to herein as "Jane Doe" or "Doe" for confidentiality purposes.

19. Dr. Coleman, Adele, and Doe spoke for a while about their shared interests in kayaking, music, nature, being new to Greensboro[5], and their love of dogs. Dr. Coleman and Adele have a dog that shares a name with Doe and the three joked about this name-sharing throughout the evening. This was the first time Dr. Coleman or Adele met Doe.

20. Doe approached Dr. Coleman and Adele again at another social gathering the following week on 13 November 2020. Dr. Coleman, Adele, and Doe conversed about their shared interests and continued joking about Doe and their dog sharing a name. The dog also attended the social gathering.

21. While Doe interacted with Dr. Coleman's dog, Dr. Coleman asked whether she wanted a picture. Doe responded yes, and Dr. Coleman took a photo of Doe with his dog. Doe said she wanted a copy of the photo and they exchanged cellphone numbers to enable Dr. Coleman to send Doe the photo.

22. Dr. Coleman sent the photo to Doe and Doe responded by sending a "love/heart" emoji reaction to the photo. A copy of the entire text exchange between Dr. Coleman and Doe is attached as Exhibit B.[6]

---

[5] Doe had recently moved to Greensboro from out of state.
[6] Please note the exchange has been redacted to protect Doe's identity by omitting Doe's name and blotting out Doe's face from photographs, but the exchange has not been otherwise altered.

Case 1:21-cv-00723-CCE-LPA   Document 1   Filed 09/17/21   Page 8 of 100

23. Doe and Dr. Coleman continued exchanging text messages for the next two weeks (13 November 2020 to 25 November 2020), discussing their shared interests in music, kayaking, nature, pizza, Pittsburgh, Dr. Coleman's dog, and Doe's sister's dog. Both Dr. Coleman and Doe used emojis, "heart/love" reactions, and exclamation points to convey their reactions and responses to one another's messages. *See generally* Exhibit B.

24. The message exchanges never reference nor suggest any sexual acts, sexually derogatory language, or sex organs; do not solicit sex, offer sexual acts or make sexual innuendos; do not include any comment on either individuals' sexual attractiveness, gender, sex, sexual orientation, prior sexual experiences, prior sexual partners or romantic relationships; and do not include any pornographic or otherwise contain sexual images or content. *See generally* Exhibit B.

25. On 21 November 2020 Doe joined Dr. Coleman, his wife Adele, and Dr. Coleman's adult stepson, Cecil McCumber III for breakfast and kayaking at Dr. Coleman and Adele's home on Lake Jeanette. Adele gave Doe a tour of the house while Dr. Coleman cooked breakfast.

26. After breakfast Dr. Coleman, Adele, and Doe took their kayaks out on the lake. Doe mentioned her Thanksgiving plans fell through and Adele invited Doe to join them for Thanksgiving. Doe indicated she may join them, but that she was considering other options.

27. Adele left the lake after about 40 minutes and Doe and Dr. Coleman continued kayaking to various sites around the lake for approximately twenty minutes before being

9

joined by Dr. Coleman's stepson, Cecil McCumber. Doe and Dr. Coleman discussed Dr. Coleman's move to UNCG and his career history.

28. Doe, Dr. Coleman, and Cecil McCumber returned to the house; McCumber carried Doe's kayak to her car and Doe left.

29. No sexual or romantic conversations occurred during Doe's visit. Doe gave no indication of being uncomfortable during or after the event. The brunch followed by kayaking happened to be the third and final in-person interaction between Doe and Dr. Coleman.[7]

30. On 14 December 2020 Dr. Coleman was notified by Defendant Gilliam that Doe had accused Dr. Coleman of sexual harassment based on their two-week text communication in November 2020, and that a formal Title IX Complaint had been initiated.

31. On 1 September 2021 UNCG dismissed the Complaint against Dr. Coleman because the text message allegations did not constitute sexual harassment, even if proven true—but UNCG's dismissal came only after Dr. Coleman was terminated; publicly maligned; and subjected to a more than 8-month-long "investigation".

32. UNCG dismissed the Complaint twelve (12) days after Dr. Coleman communicated his intent to seek judicial relief from UNCG's Title IX and constitutional abuses through filing the instant suit.

---

[7] Dr. Coleman's wife, Adele, was present for all three in-person interactions between Doe and Dr. Coleman.

## II. Title IX Overview

33. Title IX of the Higher Education Act of 1965, 20 U.S.C. § 1681 *et. seq.*, ("Title IX") provides in pertinent part:

> **No person** in the United States **shall, on the basis of sex**, be excluded from participation in, be denied the benefits of, or **be subjected to discrimination** under any education program or activity receiving Federal financial assistance[.] (emphasis added).

34. Congress enacted Title IX with a two-fold objective to: (1) "avoid the use of Federal resources to support discriminatory practices" and (2) "provide individual citizens effective protection against those practices." *Cannon v. University of Chicago*, 441 U.S. 67, 704 (1979).

35. § 1682 of Title IX provides an enforcement mechanism by authorizing agencies providing federal financial assistance to any education program to promulgate regulations ensuring recipients' adherence to Title IX's antidiscrimination mandate and to terminate federal funds or deny future grants to noncompliant institutions. *See North Haven Bd. Of Ed. V. Bell*, 456 U.S. 512 (1982).

36. In addition to administrative enforcement by funding agencies, Title IX is enforceable by an implied private cause of action available to students and employees of covered educational institutions. *See id.*; *see also Waters v. Drake*, 222 F. Supp. 3d 582, 343 (S.D. Ohio 2016).

11

37. Pursuant to Title IX's enforcement mechanism under § 1682, the U.S. Department of Education, Office for Civil Rights (the "Department") issues Title IX's implementing regulations. 34 C.F.R. §§ 106.1 to 160.71.

38. The first Title IX regulations enacted in 1975 addressed prohibited sex discrimination in hiring, admissions, athletics, and other aspects of the institution's programs or activities and required recipients designate an employee to coordinate the recipient's compliance with Title IX and to adopt grievance procedures allowing for prompt and equitable complaint resolution. 40 Fed. Reg. 24,128 (June 4, 1975) (codified at 45 C.F.R. part 86).

39. The Department also issues non-legally binding guidance documents that recipient institutions have historically used in promulgating grievance procedures, but the Department has since found such procedures inadequate because they:

> [L]acked basic procedural protections for complainants and respondents and have appeared biased for or against complainants, or respondents. The result has been unpredictable Title IX adjudication systems under which complainants and respondents too often have been thrust into inconsistent, biased proceedings that deprive one or both parties of a fair process[.]

Executive Summary No. 97, 34 C.F.R. § 106, at 30049.

40. In 2020 the Department announced it was issuing final regulations (the "Final Rule") that imposed legally binding rules governing recipient institutions' responses to sexual harassment.

41. The Final Rule was largely a response to the Department's determination that:

12

> Department guidance is insufficient to provide clear direction on this subject because it is not legally enforceable, has created confusion and uncertainty among recipients, and has not adequately advised recipients as to how to uphold Title IX's non-discrimination mandate while at the same time meeting requirements of constitutional due process and fundamental fairness.

*Id.* at 30030.

42. Importantly, the Final Rule insists "**Recipients may not treat a respondent as responsible for sexual harassment without providing due process protections**" and recipients must follow "a **fair** grievance process that gives clear procedural rights to **both parties**" prior to a determination of the respondent's responsibility to "ensure a **fair** and **reliable** factual determination." *Id.* at 30030 (emphasis added).

43. The Final Rule also "**expressly prohibit[s] retaliation against individuals for exercising their rights under Title IX**"[8] and warns that "[a] recipient's treatment of a complainant or a respondent in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under title IX." 34 C.F.R. § 106.45(a) (emphasis added).

44. According to the Department, the Final Rule's explicit imposition of procedural rights "reflect the very serious nature of sexual harassment and **the life-altering consequences that may follow a determination regarding responsibility for such conduct**" and "each of the procedural requirements in § 106.45 is prescribed because the Department views the requirement as important to ensuring a fair process for both parties

---

[8] *Id.* at 30031.

13

rooted in fundamental due process principles of notice and meaningful opportunities to be heard." Executive Summary, No. 97, 34 C.F.R. § 106, at 30049 (emphasis added).

45. The Department's preamble summary[9] of the Final Rule's standardized framework is provided in pertinent part in the following paragraphs (¶¶46-54):

46. Section 106.45(b)(1)(i)—(x) requires recipients adopt a grievance process that:

    a. Treats complainants and respondents equitably by recognizing the need for complainants to receive remedies where a respondent is determined responsible and for respondents to face disciplinary sanctions only after a fair process determines responsibility;

    b. Objectively evaluates all relevant evidence both inculpatory and exculpatory, and ensures that rules voluntarily adopted by a recipient treat the parties equally;

    c. Requires Title IX Coordinators, investigators, decision-makers, and persons who facilitate informal resolutions **to be free from conflicts of interest and bias and trained to serve impartially without prejudging the facts at issue**;

    d. **Presumes non-responsibility of respondents until conclusion of the grievance process**; and

    e. **Includes reasonably prompt time frames for conclusion of the grievance process**.[10]

47. Section 106.45(b)(2) requires written notice of the allegations to both parties.

---

[9] 85 Fed. Reg. 30053-54. The preamble clarifies the Office of Civil Right's interpretation of Title IX and the Title IX regulations.

[10] Although the Final Rule does not specify what time frame is "reasonably prompt," the withdrawn department guidance titled "2011 Dear Colleague Letter" recommended a 60-day time frame based on guidance from the Office of Civil Rights providing that a typical investigation takes approximately 60 calendar days following receipt of the complaint. 85 Fed. Reg. at 30055, fn 275.

14

48. Sections 106.45(b)(3)—(b)(4) require recipients to investigate formal complaints, [and] describe[s] when a formal complaint is subject to mandatory or discretionary dismissal:

> If the conduct alleged in the formal complaint would not constitute sexual harassment as defined in § 106.30 even if proved [ . . . ] then the recipient must dismiss the formal complaint[.] 34 C.F.R. §106.45(b)(3)(i).
>
> [ . . . ]
>
> The recipient may dismiss the formal complaint or any allegations therein, if at any time during the investigation or hearing: A complainant notifies the Title IX Coordinator in writing that the complainant would like to withdraw the formal complaint or any allegations therein; the respondent is no longer enrolled or employed by the recipient; or specific circumstances prevent the recipient from gathering evidence sufficient to reach a determination as to the formal complaint or allegations therein.
>
> 34 C.F.R. § 106.45(b)(3)(ii).

49. Section 106.45(b)(5)(i)—(vii) requires recipients to investigate formal complaints in a manner that:

a. **Keeps the burden of proof and burden of gathering evidence on the recipient**;
b. Provides the parties equal opportunity to present fact and expert witnesses and other inculpatory and exculpatory evidence;
c. Does not restrict the parties from discussing the allegations or gathering evidence;
d. Requires written notice when a party's participation is invited or expected for an interview, meeting, or hearing;
e. **Provides both parties equal opportunity to review and respond to the evidence gathered during the investigation**; and

f. Sends both parties the recipient's investigative report summarizing the relevant evidence, prior to reaching a determination regarding responsibility.

50. Section 106.45(b)(6) requires a live hearing with cross-examination conducted by the parties' advisors at postsecondary institutions.

51. Section 106.45(b)(7) requires a decision-maker who is not the same person as the Title IX Coordinator or the investigator **to reach a determination regarding responsibility by applying the standard of evidence** the recipient has designated in the recipient's grievance process for use **in all formal complaints of sexual harassment**. (emphasis added).

52. Section 106.45(b)(9) allows recipients to offer and facilitate informal resolution processes rather than formal investigations.

53. Section 106.45(b)(10) requires recipients to maintain records and documentation concerning sexual harassment reports, formal complaints, investigations, and adjudications.

54. As detailed herein, UNCG—helmed by Defendant Gilliam—balked at its obligation to provide Dr. Coleman the fair and equitable process mandated by Title IX. Instead, UNCG weaponized the Title IX process against Dr. Coleman by pursuing a biased investigation based on insufficient allegations and using the allegations to coerce and intimidate Dr. Coleman into resigning.

### III.  UNCG weaponizes Title IX against Dr. Coleman.

55. Dr. Coleman first learned of the Title IX allegations in a meeting with the Chancellor on 14 December 2020; this meeting was one of five (5) total Title IX-related meetings in the more than 8-month-long "investigation".[11]

56. Partway through what Dr. Coleman believed was a routine meeting with the Chancellor on 14 December 2020, Defendant Gilliam announced, without warning or proper notice, that a Title IX Complaint (the "Complaint" or "Title IX complaint") had been filed against him by a fellow faculty member[12] alleging sexual harassment. A copy of the Notice of Investigation, herein referred to as the "Complaint", is attached as Exhibit C.[13]

57. At this point in time, then Associate Vice Chancellor for Strategy and Policy, Defendant Julia Jackson-Newsom ("Defendant Jackson-Newsom"), joined the meeting but did not verbally participate. During all relevant times throughout Dr. Coleman's Title IX process Defendant Jackson-Newsom served as the Senior Title IX Administrator at UNCG, was Defendant Gilliam's direct subordinate, and was a member of the Chancellor's Council.

---

[11] Dr. Coleman met with Defendant Gilliam twice after the Title IX process initiated: once on 14 December 2020 and once on 22 December 2020; Dr. Coleman participated in two investigative Title IX interviews: one on 16 December 2020 and one on 1 April 2021; the Complaint was dismissed during Dr. Coleman's final meeting with investigators on 1 September 2021, detailed further herein.

[12] The faculty member, referred to herein as "Jane Doe" or "Doe", is a professor at UNCG and thus is a technical subordinate of the provost, but Doe was not a direct report and did not work in the same building as Dr. Coleman.

[13] Throughout the Title IX process Dr. Coleman understood the Notice of Investigation (Exhibit C) to be the Formal Complaint; but based on language from the recent Dismissal Letter—attached as Exhibit Z—Dr. Coleman now believes the Notice of Investigation is not the Formal Complaint and Dr. Coleman has not been provided any other document noticing the allegations against him. Please note that Exhibit C has been redacted to protect the complainant's identity but has not been otherwise altered.

58. Defendant Gilliam did not give or show Dr. Coleman a copy of the Complaint but said the Complaint alleged Dr. Coleman and Doe's two-week text message correspondence constituted sexual harassment.

59. The entire Title IX Complaint[14] alleges Dr. Coleman sexually harassed Doe *both on and off-campus* when he:

- Sent messages including **words** like: "I would love to see you here", "Looking forward to seeing u again soon!", "I will just be jealous of the folks hanging with the dark haired one...haha..", "I'd love to see u", "I really like u...and hope to get to know you better **without making u uncomfortable**...", "**Good night!**", "I live to flatter you", "You are kind of magnetic...or there is something about [Doe]..", "Wish I could be your piano student.", "**Good morning**", "You just make me like you more and more every time you tell me about yourself.", "Sleep well", **and more** that made [Doe] uncomfortable;
- Wrote, played for, recorded, sent to, and named a song after [Doe]: "[Doe] song"[15];
- Sent text messages to [Doe] daily from November 13, 2020 to November 25, 2020, **only stopping** on November 26, 2020 **because [Doe] told you she was uncomfortable**;
- Continued sending several text messages on November 27, November 28, December 1, and December 4, 2020 after she told you your messages made her uncomfortable and that she "**would like to stay in touch**, but perhaps on a less frequent basis";
- Continued to try and engage with [Doe] by text message after [Doe] stopped responding. "**Work message**: I am

[14] The document referred to herein as the Title IX "Complaint" is the Notice of Investigation Dr. Coleman received via email from Coordinator/Investigator Chappell on 14 December 2020, attached as Exhibit C. Because this was the only document Dr. Coleman received informing him of the allegations against him, Dr. Coleman understood this document to be the "Formal Complaint" filed by Doe; however, certain language from the 1 September 2021 Dismissal Letter (attached as Exhibit Z) suggests the Notice of Investigation is not the Formal Complaint.
[15] This refers to a 1.25 minute improvised piano instrumental with no lyrics; during their text exchange, Dr. Coleman and Doe joked that the title should be "song for the non-canine [name]". Dr. Coleman titled the song "Ode to Lake Jeannette" in his online posting available via the following link:
https://studio.youtube.com/video/l9IXkvKZh1Q/edit (last accessed 12 July 2021).

> doing a presentation to our board of trustees. I want to give a nod to the creativity and energy of our faculty during covid and want to give a shout out to Brews-keys and you. All positive! Are u ok if I do that?"
>
> - Continued to communicate with [Doe] when you sent her an email **soliciting her opinion on the reappointment of the Director of the School of Music** after [Doe] said: "**I appreciate your message**. I'm shocked that you didn't realize that you put me in a stressful, uncomfortable situation. I think **I underplayed** in my previous text how much your interactions affected me. It made me wanting to apply for other jobs and quit working at UNCG. **I previously said that I would be okay being friends**, but reflecting on it more, **I truthfully need some time and space** away from this whole situation. **If you need to contact me, you can email me at my work email.**"

Exhibit C, p. 1, emphasis added.

60. As shown by the full text-message exchange, attached as Exhibit B, the Title IX Complaint allegations are cherry-picked text messages lacking context thereby presenting a distorted factual narrative.

61. Importantly, the Title IX Complaint omits all of Doe's preceding messages to Dr. Coleman that reveal the frequency of Doe's text messages to Dr. Coleman mirrored the frequency of Dr. Coleman's text messages, and the Complaint does not include Doe's eager responses to Dr. Coleman's messages that include her sending "heart/love" emoji reactions, pictures of her sister's dog and of locations where she exercises, and an acknowledgement by Doe that she did not want to divulge their correspondence to her dean because it could be wrongly misinterpreted. *See*, e.g., Exhibit B, pp. 1; 9; 11-12; 18; 48; and 55-56.

19

62. During their 14 December 2020 meeting, Defendant Gilliam expressed his outrage to Dr. Coleman about the text exchange, making several rhetorical remarks asking how/why Dr. Coleman could have participated in the two-week correspondence with Doe.

63. Without warning or the benefit of reviewing the complaint allegations, Dr. Coleman explained to Defendant Gilliam that: (i) he genuinely liked Doe as a person and considered Doe a good faculty member; (ii) he tried to ensure that Doe felt free to tell him if Doe ever became uncomfortable corresponding; (iii) Dr. Coleman's high functioning Asperger's can make him seem intense and hinder his social acumen[16]; and (iv) the messages contained no sexual comments or content.

64. The Chancellor dismissed Dr. Coleman's responses and referred to—or at least implied—that Dr. Coleman's explanations were "bullshit" and indicated he had fired a soccer coach so he would have "no problem" terminating Dr. Coleman.

65. Defendant Gilliam did not seek any further information from Dr. Coleman regarding the two-week text exchange or about Dr. Coleman's diagnosed Asperger's.

66. The Chancellor continued admonishing Dr. Coleman about how the Complaint put UNCG and the Chancellor's reputation at "great risk" and had personally embarrassed Defendant Gilliam because the Chancellor had pulled Dr. Coleman from the "non-

---

[16] Dr. Coleman has been diagnosed as a high functioning Asperger's, alternatively referred to as being Neurodiverse or "on the spectrum". As a high functioning Asperger's, Dr. Coleman has difficulty perceiving subtle social cues, but, like others on the spectrum, such as entrepreneur Elon Musk, Dr. Coleman's Asperger's also contributes to his extremely high intellect and ability to easily master extraordinary abilities.

Case 1:21-cv-00723-CCE-LPA   Document 1   Filed 09/17/21   Page 20 of 100

interview" pool to interview Dr. Coleman as a finalist and ultimately appoint him as provost.

67. The Chancellor also expressed concern that several female senior administrators knew of the allegations against Dr. Coleman and that the Chancellor felt pressure from those female administrators to act aggressively, implying that if Dr. Coleman were to continue as Provost it would damage Defendant Gilliam's working relationship with those female administrators.

68. Defendant Gilliam periodically glanced at, what appeared to Dr. Coleman to be, a thin 2–5-page document in a file folder throughout the meeting—making comments after glancing at the document. Upon information and belief, the document did not contain the full text message exchange between Doe and Dr. Coleman. Defendant Gilliam did not permit Dr. Coleman to review the document.

69. Prior to angrily leaving the meeting, Defendant Gilliam indicated the Title IX investigation would proceed with Murphie Chappell[17] and Jeanne Madorin[18] serving as investigators and stated he would wait for the Title IX investigation results before taking action.

70. Eight (8) days later, Defendant Gilliam unilaterally judged Dr. Coleman responsible for the allegations, terminated Dr. Coleman as Provost, and threatened to

---

[17] In addition to her role as Title IX Investigator, Murphie Chappell is UNCG's Title IX Coordinator and Director of Campus Violence Response Center.
[18] In addition to acting as a Title IX Investigator, Jeanne Madorin is the Associate Vice Chancellor for Human Resources and a member of the Chancellor's Council.

issue a public statement accusing Dr. Coleman of misconduct if Dr. Coleman did not resign his tenured professorship at UNCG, as detailed below.

71. Defendant Gilliam did not adhere to his representation of waiting for the Title IX investigation results; rather, upon information and belief, the Chancellor weaponized the Title IX process to remove Dr. Coleman from UNCG—based solely on summary allegations—without affording Dr. Coleman his due process rights to defend against the allegations through the Title IX process.

72. At the Chancellor's request, Dr. Coleman had a second meeting with Defendant Gilliam on 22 December 2020—only four days after his initial Title IX investigation interview on 16 December 2020, detailed in Section IV below.

73. Dr. Coleman was not told beforehand the purpose of this second meeting with the Chancellor as Dr. Coleman received notification of this meeting via email from the Chancellor's Chief of Staff on 21 December 2020 at 4:46 p.m.

74. Defendant Gilliam started the second meeting by terminating Dr. Coleman as Provost and had a termination letter in an envelope placed at Dr. Coleman's seat before Dr. Coleman arrived.

75. The Chancellor repeatedly stated Dr. Coleman's termination would be "*for cause*" because Dr. Coleman's two-week correspondence with Doe "*crossed the line*."

76. While Defendant Gilliam may be free terminate an at-will employee for no reason at all, Defendant Gilliam may not terminate an employee for unlawful reasons such as the individual's sex or to impede an official pending Title IX proceeding. Chancellor

Gilliam's position at UNCG does not shield him from liability for intentionally abusing the Title IX process prior to and before a Title IX investigation had been completed, nor is he shielded from liability for using his authority to obstruct justice by interfering with Dr. Coleman's Title IX process.

77. Defendant Gilliam told Dr. Coleman he "consulted with" the Title IX investigators (Murphie Chappell and Jeanne Madorin), the System President and System Chief Academic Officer in making his decision to terminate Dr. Coleman, and that the President and Chief Academic Officer agreed with Defendant Gilliam's decision

78. Defendant Gilliam did not tell Dr. Coleman what information had been shared by the Title IX investigators (Murphie Chappell and Jeanne Madorin) or with the System President and System Chief Academic Officer in making the decision to terminate Dr. Coleman as Provost.

79. Defendant Gilliam further stated he had contacted the search firm who recruited Dr. Coleman for the provost position and that the search firm was surprised and told Defendant Gilliam it had no knowledge of Dr. Coleman ever being accused of misconduct based on their detailed background investigation of Dr. Coleman.

80. Dr. Coleman had never been accused, much less found responsible, of improper conduct with another person throughout his 30-year career in academia.

81. After lamenting that Dr. Coleman had "greatly damaged" Defendant Gilliam's personal reputation and his "working relationship with female leadership" Defendant Gilliam stated: **"I only care about the University, I don't give a shit about you."** At

this point in time Dr. Coleman was—and is—a University employee entitled to the same

respect and consideration from the University's Chancellor that is afforded to all

University employees, and Defendant Gilliam's statement that he "only care[d] about the

University" and that he "[didn't] give a shit about [Dr. Coleman]" demonstrates

Defendant Gilliam's biased self-interest and lack of objectivity in Dr. Coleman's Title IX

case.

82. Because the Chancellor could not terminate Dr. Coleman from his contractual

tenured professor position without implicating a lengthy tenure removal process

following the completion of the Title IX investigation, Defendant Gilliam instead told Dr.

Coleman the Title IX process would end if Dr. Coleman agreed to resign from his

professorship in addition to being terminated as Provost.

83. Defendant Gilliam presented Dr. Coleman with the following two options:

(1) Dr. Coleman could resign immediately, receive three months' severance pay; the University would publish a **jointly-negotiated statement** regarding Dr. Coleman's resignation; and **the Title IX Investigation would cease upon Dr. Coleman leaving the University**; or

(2) Defendant Gilliam would terminate Dr. Coleman as Provost; Dr. Coleman would retreat to his tenured position as professor of biology at a salary nearly two-thirds less than the total compensation[19] he had been receiving and a lower salary than he deserved relative to his experience, national recognition, and qualifications;[20] **the Title IX investigation would continue**; and

---

[19] Defendant Gilliam told Dr. Coleman that Associate Vice Chancellor for Human Resources, Jeanne Madorin, determined Dr. Coleman's retreat salary. Jeanne Madorin was already serving as a Title IX investigator on Dr. Coleman's case when she determined his retreat salary.

[20] Dr. Coleman is the only UNCG faculty member in a STEM discipline who is an elected Fellow of the American Association for the Advancement of Science. The suggested retreat salary is on par with other biology faculty; however, those faculty members do not have the same record of productivity and national impact as Dr. Coleman,

> Defendant Gilliam would **publish a statement that Dr. Coleman was terminated for "cause."**

84. Defendant Gilliam indicated if Dr. Coleman chose to retreat to faculty the Title IX investigation would continue.

85. Defendant Gilliam knew, or should have known, that a public statement that Dr. Coleman was terminated as Provost for "*cause*" 6 months after being appointed would interfere with the Title IX process by creating a perception of guilt and would destroy Dr. Coleman's career in academia.

86. Defendant Gilliam verbally communicated these retaliatory threats to Dr. Coleman in their 22 December 2020 meeting. Moreover, Defendant Gilliam lodged thinly veiled threats in Dr. Coleman's termination letter, that omitted the "*cause*" Defendant Gilliam articulated in their meeting that the text message exchange "*crossed the line*". A copy of Defendant Gilliam's termination letter ("Chancellor Gilliam's Termination Letter") is attached as Exhibit D.

87. Chancellor Gilliam's Termination Letter advised he was terminating Dr. Coleman as provost "pursuant to University of North Carolina 300.1.1 Policy on Senior Academic and Administrative Officers" and that: Dr. Coleman was being returned to the Department of Biology pursuant to his rights as a professor with tenure; Dr. Coleman's

---

and the amount is not commensurate with senior faculty in other departments who have similarly productive records to Dr. Coleman. For example, Dana Dunn—who was provost prior to Dr. Coleman and returned to a faculty professor position in the sociology department after serving as provost—receives a $150,000.00 salary. Dunn's salary is $30,000.00 more than Dr. Coleman's faculty salary, despite Dr. Coleman having equal or greater administrative experience and academic record, including Dr. Coleman's strong publication and grant record. UNCG's Salary Information Database states that its salary data is "current as of June 30, 2021" and can be accessed via the following link: https://uncdm.northcarolina.edu/salaries/index.php# (last accessed 13 September 2021).

annual salary was reduced to $120,000.00; Dr. Coleman would no longer receive his

$750.00/month car allowance; and the University would no longer maintain his country

club membership. *See* Exhibit D.

88. Upon information and belief, Defendant Gilliam facilitated another, more

detailed, termination letter by UNCG's General Counsel, Jerry Blakemore, sent to Dr.

Coleman's attorney the same day (22 December 2020). Blakemore's Termination Letter

reiterated the effect of Dr. Coleman's termination as provost and return to faculty (as

stated in Chancellor Gilliam's Termination Letter) but added that the Title IX

investigation would continue unless Dr. Coleman chose to voluntarily resign from the

University:

> Please note that **the Title IX investigation is ongoing**, [ . . . ]
> **[i]n the alternative, in the event Dr. Coleman separates
> from the University** for reasons as mutually agreed upon by
> the parties, the University will provide him with 90 days
> severance at the current Provost salary and would be
> amendable to discussing a mutually agreed upon statement
> regarding the separation. **The University is fully prepared to
> go forward with the actions outlined in this correspondence**
> and subject to discussions with you and/or your client, will do
> so effective by close of business Wednesday, December 23,
> 2020.

A copy of Blakemore's termination letter ("Blakmore's Termination Letter")
is attached as Exhibit E.

89. Dr. Coleman's counsel received Blakemore's Termination Letter via email from

Kristen Bonatz, Deputy General Counsel for UNCG ("Deputy Bonatz"). Deputy Bonatz

sent Dr. Coleman's counsel a second email on 22 December 2020 attaching a document

26

with "Attorney Client Privilege" and "Statement Draft" written at the top ("Bonatz' email" and "Statement Draft").[21] A copy of Bonatz' email is attached as Exhibit F; a copy of the "Statement Draft" is attached as Exhibit G.

90. The body of Bonatz' email explained the University's intentions in sending the attached Statement Draft:

> The University plans to issue one of the attached statements at or around 12 noon tomorrow. Although **our plan is to issue the statement indicating that Dr. Coleman has been removed as Provost** (Option 1), we are presenting for your client's consideration a second option. **The second option would *allow your client to pursue other administrative or faculty options outside of UNC Greensboro*, *avoid the possibility of further action* taken on the part of UNC Greensboro**, and would allow your client to collect, at a minimum the severance outlined in our earliest communication.

*See* Exhibit F (emphasis added).

91. The attached Statement Draft provided in pertinent part:

> **OPTION 1: UNCG Removes Provost; Interim Named as Search Begins**
> UNC Greensboro today announced that is has removed Dr. Jim Coleman from the office of Provost due to behavior that did not meet expectations for senior leaders at UNCG. Dr. Coleman joined UNCG in July 2020 from the same role at the University of Arkansas. Dr. Coleman, per university policy, will retreat to the faculty in the Department of Biology. Given this is a confidential and ongoing personnel matter, the University will provide no further details to protect the privacy of all involved.
> [ . . . ]
> **OPTION 2: UNCG Provost to Leave University**

---

[21] It is unclear why the document states "Attorney Client Privilege" as any privilege was waived by intentionally providing the document to Dr. Coleman's counsel as an email attachment, per language in the body of the email: "The University plans to issue one of the attached statements at or around 12 noon tomorrow." Exhibit F.

> UNC Greensboro today announced that Provost Jim Coleman has resigned from the University effective December 23. Dr. Coleman joined UNCG in July 2020 from the same role at the University of Arkansas and has helped shepherd UNCG through the very difficult Fall 2020 Semester.

*See* Exhibit G.

92. At the conclusion of Defendant Gilliam's meeting with Dr. Coleman, Defendant Gilliam afforded Dr. Coleman less than twenty-four (24) hours to choose between the two "options" and further directed him to vacate his office by 5:00 p.m. the next day (23 December 2020).

93. On 23 December 2020 at 3:01 p.m.—and without further communication with Dr. Coleman—Defendant Gilliam carried out his threat and published the following scandalizing statement that includes language from the Statement Draft "Option 1":

> UNC Greensboro today announced that it has **removed Jim Coleman** from the office of Provost **due to behavior that did not meet expectations for senior leaders at UNCG.**

*See* UNCG's announcement (the "Termination Announcement") (emphasis added) attached as Exhibit H.

94. Upon information and belief, Defendant Gilliam either personally published the Termination Announcement or directly authorized its publication through a posting on the official UNCG website and via university email to all full, part-time, and temporary University faculty and staff the same day.[22]

---

[22] The original UNCG Webpage Termination Announcement was posted 23 December 2020 but the post was updated 29 January 2021 to remove any mention of Dr. Coleman and the original termination post is no longer available on UNCG's webpage. The updated webpage can be accessed by the following link: https://news.uncg.edu/removes-provost-interim-named-search-begins/ (last accessed 14 July 2021).

95. Upon information and belief, the Termination Announcement was also sent to UNCG's Board of Trustees, alumni, and major university donors.

96. Upon information and belief, Defendant Gilliam either personally authored the Termination Announcement or directed the author regarding what language to use in the Termination Announcement, because Defendant Gilliam is "the leader of and the official spokesperson for [UNCG]" in his role as Chancellor of UNCG.[23]

97. UNCG's official twitter account republished the Termination Announcement via a link to the UNCG webpage announcement (the "UNCG Termination Tweet").[24]

98. The Termination Announcement was then published by more than six news publications nationwide, including by: *Triad City Beat*[25]; *Arkansas Democrat-Gazette*[26]; *WFMY News 2*[27]; *Greensboro News & Record*[28]; *News Break*[29]; and *US Wall Post*[30]. Downloaded copies of articles from *Triad City Beat*, *Arkansas Democrat-Gazette*, *WFMY News 2*, and *Greensboro News & Record* are combined in a PDF attached as Exhibit J.

---

[23] *See The UNC Code*, Chapter V, § 502.D.

[24] A screenshot of the UNCG Termination Tweet is attached as Exhibit I and is accessible via the following link, https://twitter.com/UNCG/status/1341838574401024002 (last accessed 24 June 2021).

[25] Jordan Green, Jim Coleman removed from provost position at UNCG, News, (23 January 2021) https://triad-city-beat.com/jim-coleman-removed-provost-position-uncg/.

[26] Ex-UA provost removed from N.C. post, Morning News Letter (25 December 2020), https://www.arkansasonline.com/news/2020/dec/25/ex-ua-provost-removed-from-nc-post/.

[27] Brian Bennett, Interim named after UNCG removes Jim Coleman from the office of Provost, Local News (23 December 2020), https://www.wfmynews2.com/article/news/local/uncg-removes-provost/83-0f735a9e-0821-4bbf-a12e-db62e69d9f60.

[28] John Newsom, UNCG names new provost; Debbie Storrs is hired from North Dakota, Top Story (19 May 2021), https://greensboro.com/news/local/education/uncg-names-new-provost-debbie-storrs-is-hired-from-north-dakota/article_0dec1a94-b8c5-11eb-b56e-f376daa32f79.html.

[29] Jordan Green, Jim Coleman removed from provost position at UNCG, Colleges (23 December 2020), https://greensboro.com/news/local/education/uncg-names-new-provost-debbie-storrs-is-hired-from-north-dakota/article_0dec1a94-b8c5-11eb-b56e-f376daa32f79.html.

[30] Transitions: New President Selected at Concordia U., in Nebraska; Interim Provost Named at U. of North Carolina at Greensboro, Education (14 January 2021), https://uswallpost.com/education/transitions-new-president-selected-at-concordia-u-in-nebraska-interim-provost-named-at-u-of-north-carolina-at-greensboro/.

Case 1:21-cv-00723-CCE-LPA   Document 1   Filed 09/17/21   Page 29 of 100

99. The UNCG Termination Tweet was republished (via "retweet") by at least three other Twitter accounts; was republished via "Twitter-quote" by at least two other Twitter accounts; was commented on by at least three other Twitter accounts; was "liked" by at least five other Twitter accounts; and was viewed by an indeterminable number of persons due to the public nature of the social media forum that does not provide a public site-generated calculation of total post views.[31]

100. A Twitter account represented as "Kate Crowe/@kcrowe" (herein "kcrowe") posted two public comments on the UNCG Termination Tweet that are still available to view as of 14 June 2021.[32]

101. The first kcrowe comment states:

> **My admin dad still refers to people forced out of administrative positions as 'returning to their first love of teaching' so now every time I see some form of this in a press release I lol. I hope this is to the good for y'all.**

*See* Exhibit L (emphasis added).

102. The second kcrowe comment states:

> **Sometimes ppl [people] are legit returning to teaching bc of admin burnout or for other reasons, but usually it's code for "they were a bad administrator and we couldn't fire them as a faculty member."**

*See* Exhibit L (emphasis added).

---

[31] PDF screenshots of the aforementioned UNCG Tweet activity are attached as Exhibit K; the original UNCG Tweet is accessible via the link in footnote 24, above.

[32] Screenshots of the Kcrowe comments are attached as Exhibit L; the comments can also be accessed via the following link: https://twitter.com/UNCG/status/1341838574401024002 (last accessed 24 June 2021).

Case 1:21-cv-00723-CCE-LPA   Document 1   Filed 09/17/21   Page 30 of 100

103.     At least two other Twitter accounts "liked" the kcrowe comments but, as explained above, there is no publicly available information indicating how many people viewed the kcrowe comments. *See* Exhibit L.

104.     A Twitter account represented as "Cassandra Johnson PR/Johnson_Cassie" published the UNCG Termination Tweet using the "Twitter-quote" function and added the following commentary:

> **What in the world @uncg?! I need to know why he has
> to leave his position but keep his other job.**

*See* Exhibit M (emphasis added).

105.     Public posts on social media sites like Twitter are viewable world-wide by anyone with a Twitter account and any public post can be reposted by any other Twitter account. But, if a post was reposted from an account other than the original posting account, such re-publication is not easily traceable to determine the total number of re-publications and, as explained in ¶ 99 above, the total number of views—including second and third tier republications—is not publicly available information.

106.     Moreover, as demonstrated by the attached screenshots, anyone can save the original UNCG Termination Tweet (or any other online posting of the Termination Announcement) by taking a picture of their computer screen with the post open. The picture can then be re-distributed *ad infinitum*.

107.     As detailed below, Defendant Gilliam's Termination Announcement has interfered with Dr. Coleman's formal Title IX process; has damaged Dr. Coleman's

Case 1:21-cv-00723-CCE-LPA   Document 1   Filed 09/17/21   Page 31 of 100

professional reputation in the higher education and research communities nation-wide[33]; and has destroyed his future employment prospects.

108.     Dr. Coleman has actively sought alternate employment since Defendant Gilliam's Termination Announcement on 23 December 2020. Dr. Coleman has either applied for or expressed interest in more than twenty different positions nationwide and has either been denied the position or explicitly told not to bother applying due to the negative press generated by Defendant Gilliam's Termination Announcement.

109.     Prior to the Termination Announcement, Dr. Coleman was being actively recruited for President at Northern Arizona University where Dr. Coleman previously served as provost. However, on 30 December 2020 search consultant Alberto Pimentel texted Dr. Coleman, "The committee saw the recent news story and decided not to advance you to the next step. Sorry." Pimentel elaborated in a phone conversation with Dr. Coleman, stating Dr. Coleman may be able to recover from the bad press but that it would likely take a few years and would require the implementation of a strategy to increase Dr. Coleman's visibility and promote his accomplishments. A copy of Pimentel's text message is attached as Exhibit N.

110.     Dr. Coleman was contacted in January 2021 by The Registry for College and University Presidents—an organization that places individuals in temporary senior executive roles at universities and colleges—regarding his interest in being included in The Registry's pool of candidates for temporary senior administrative positions. A

---

[33] In addition to destroying his reputation amongst the local UNCG and triad-area community.

representative of The Registry—Galen Hench—called Dr. Coleman to inform him that UNCG's press release regarding his termination made Dr. Coleman a "non-starter" for any of their clients.

111.    On 2 February 2021 Dr. Coleman was advised by a search consultant for Boise State University's provost search that "Given the recency of the events [at UNCG], perhaps it may be best that you refrain from applying to Boise State at this particular time. As you mention, a quick google search will point to negative information which will put in question your candidacy." A copy of the Boise State email is attached as Exhibit O.

112.    A similar situation arose the following week when Dr. Coleman inquired about an open position as President of New College of Florida—a search consultant for the school emailed Dr. Coleman stating, "We have been briefed on the unfortunate situation [at UNCG]. Given the public nature of the search with the sunshine state laws, I would be hesitant to toss your hat in the ring." A copy of the New College of Florida email is attached as Exhibit P.

113.    Dr. Coleman made the screening interview phase for a dean position at his undergraduate alma mater, University of Maine, but was not selected as a finalist. Dr. Coleman was told in a phone conversation after his interview that the press release may have been concerning for some committee members.

114.    Dr. Coleman was strongly encouraged to apply for an open position as Dean of the School of Environment at the University of Washington by the search firm

that was recruiting for the position; however, Dr. Coleman did not make the screening interviews and a search consultant indicated that the UNCG press release was mentioned in their discussions regarding his application.

115.     Dr. Coleman reached out to the search firm Storbeck Search regarding the open position for president at Georgia College in May 2021 but was told in an email from senior associate Amanda Bennett not to bother applying for the position, as "The challenge of your current situation [at UNCG] may not be something the committee will be willing to take on. This is their first Presidential search in 9 years, and they may be apprehensive with any negative press on candidates, even with us here at Storbeck explaining the context." A copy of Bennett's email is attached as Exhibit Q.

116.     Dr. Coleman was told in a phone conversation with search consultant Ryan Crawford that the UNCG press release caused some concern in evaluating—and ultimately rejecting—Dr. Coleman's application for a position as Chief Research Officer at Texas State University.

117.     Dr. Coleman applied for a position he once held at the Desert Research Institute ("DRI"). The UNCG press release came up twice during Dr. Coleman's interview for this position; Dr. Coleman was one of four finalists but learned on 8 June 2021 that DRI hired one of the other three finalists. DRI's Vice President told Dr. Coleman that half of the challenge to his hiring was the negative press generated by Defendant Gilliam's Termination Announcement. Additionally, DRI faculty member and Dr. Coleman's former colleague, Jay Arnone, forwarded Dr. Coleman a text exchange

34

between two other faculty members that occurred during Dr. Coleman's presentation to DRI. In the forwarded exchange, one faculty member sent the other a link to one of the re-publications of Defendant Gilliam's Termination Announcement, and the other faculty member responded critically with negative comments about Dr. Coleman. A copy of the forwarded text message exchange from Arnone is attached as Exhibit R.

118.     More recently, Dr. Coleman was rejected for a position on The Committee on the Future of National Science Foundation's Established Program to Stimulate Competitive Research ("NSF EPSCoR"), despite his tremendous experience in NSF EPSCoR and in building research capacity in universities.

119.     Dr. Coleman's application was denied for the following positions but Dr. Coleman did not receive an explanation for the denials: President of Georgia State University; Provost at Sonoma State University; Division Director at the National Science Foundation; President of SUNY Oneonta; President of the University of Alaska Anchorage; Vice President of Research at Kansas State University; Dean of the College of Natural Resources and Science at Humboldt State University; Provost at Dalhousie University; President of Evergreen State University; and Provost at Cleveland State University.

## IV. UNCG's biased investigation and Title IX violations

120.     After leaving the first meeting with Defendant Gilliam on 14 December 2020, Dr. Coleman received an email from Murphie Chappell attaching a Notice of

Investigation—the purported Title IX Complaint—and "no-contact order"[34]; and requesting an interview with Dr. Coleman on 16 December 2020.

121. Murphie Chappell ("Chappell" or "Coordinator/Investigator Chappell") is the UNCG Title IX Coordinator in charge of "coordinating the University's efforts to comply with the University's responsibilities under Title IX" and is responsible for ensuring individuals involved in the Title IX process "carry out their responsibilities without a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent."[35]

122. Chappell is also one of two Title IX investigators that purportedly "investigated" Doe's sexual harassment allegations against Dr. Coleman.

123. In addition to her Title IX roles, Chappell is Director of UNCG's Campus Violence Response Center, whose stated mission is to "provide affirming, empowering, and confidential services to UNCG community members who have been victimized [ . . . ] [and] advocate for the just treatment of victims by providing a non-judgmental and culturally sensitive response," and that specifies its definition of "violence" includes "sexual or gender-based harassment[.]"[36] According to the Campus Violence Response Center webpage, part of Investigator/Coordinator Chappell's role as director is "to assist

---

[34] See Exhibit C.
[35] *See* UNCG Title IX Policy 5.9 and 6.1, attached as Exhibit S.
[36] The Campus Violence Response Center's mission is accessible via the following webpage: https://cvrc.uncg.edu/.

with the needs of victims and survivors as well as the growth and development of the CVRC."[37]

124. Upon information and belief, Chappell represented alleged victims of sexual assault while working as a staff attorney at the N.C. Coalition Against Sexual Assault prior to her employment with UNCG.[38] On her LinkedIn webpage, Investigator/Coordinator Chappell represents she "Developed, secured over $1 million in funding for, and implemented confidential reporting for victims of crime" and touts how reports of alleged crime "grew [sic] [an] average of 200%" during Chappell's two-year tenure and boasts that this work "piqued interest from grant funders."[39]

125. The Notice of Investigation—the document Dr. Coleman understood to be the formal Title IX Complaint submitted by Doe—was signed by Chappell as "Title IX Coordinator" and states "[Doe] alleg[es] that you *may* have engaged in behavior that violates University policy, including sexual harassment" and:

> Specifically, you are alleged to have violated the following provisions of the Title IX Policy:
> - 4(b): Sexual Harassment, as defined by 34 CFR 106.3, unwelcome conduct, on the basis of sex, determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity.

*See* Exhibit C, pp. 1; 3.

---

[37] The Campus Violence Response Center's staff descriptions are accessible via the following webpage: https://cvrc.uncg.edu/cvrc-staff/.
[38] *See* Murphie Chappell's LinkedIn webpage description of prior employment experience, accessible via https://www.linkedin.com/in/murphie-chappell-27626b52.
[39] *See* Murphie Chappell's LinkedIn webpage available via https://www.linkedin.com/in/murphie-chappell-27626b52.

126.     Nothing in the Notice of Investigation indicates why Investigator/Coordinator Chappell, rather than Doe, signed the Notice of Investigation; Dr. Coleman believed the Notice of Investigation was the "Formal Complaint" because he was not provided any other notice of Doe's allegations against him; Dr. Coleman has still not been given the Formal Complaint, even after it was dismissed; and no one has explained why the Formal Complaint was withheld or why Investigator/Coordinator Chappell signed the Notice of Investigation.

127.     The entire Notice of Investigation (Title IX Complaint), reproduced above ¶ 59, alleges Dr. Coleman sexually harassed Doe "**both on *and* off-campus**" and, as shown by the full text message exchange attached as Exhibit B, these allegations are cherry-picked text messages lacking context and thereby presenting a distorted factual narrative.

128.     Dr. Coleman is without knowledge as to whether Doe cherry-picked these messages and presented them to the UNCG Title IX office as a complaint, or whether Doe provided the full message exchange and the Title IX office cherry-picked the messages used in the Title IX Complaint. Either scenario constitutes unlawful conduct and suggests pervasive anti-male bias.

129.     If Doe chose the text messages to  support an inaccurate sexual harassment complaint and the Title IX office thereafter failed to obtain the full text message exchange prior to initiating the complaint and/or investigation process, this demonstrates UNCG's anti-male bias–in addition to casting significant doubt on Doe's credibility and

38

motive, all amounting to a violation of UNCG's Title IX Policy that prohibits "[a]ll University community members" from "providing false or misleading information in bad faith or with a view to personal gain or intentional harm to another[.]" *See* UNCG Title IX Policy § 7.9 attached as Exhibit S.

130.    If the latter scenario is true and the Title IX office chose the specific messages out of the full exchange to support its Title IX complaint, this selective process to compel a result against Dr. Coleman reveals UNCG's overt and intentional discrimination against Dr. Coleman on the basis of his male sex.

131.    Dr. Coleman provided investigators the entire text message exchange between him and Doe after his second investigative interview on 1 April 2021; thus, investigators had actual knowledge of the full message context by at least 1 April 2021; notwithstanding, investigators chose not to dismiss the deficient allegations against Dr. Coleman and continued "investigating" for another five months.

132.    Even absent context from the full text message exchange, the Complaint allegations—even if true—do not constitute sexual harassment as defined by 34 C.F.R. § 106.3 and UNCG was obligated to dismiss Doe's complaint pursuant to 34 C.F.R. § 106.45(b)(3)(i).

133.    34 C.F.R. § 106.45(b)(3)(i) requires recipient schools to dismiss sexual harassment allegations if the reported conduct itself does not meet the following Title IX definition:

> *Sexual harassment* means conduct on the basis of sex that
> satisfied one or more of the following: (2) Unwelcome
> conduct determined by a **reasonable person** to be **so
> severe, pervasive**, *and* **objectively offensive** that it
> **effectively denies a person equal access** to the
> recipient's education program or activity.

34 C.F.R. § 106.30(a)(2) (emphasis added).

134.     Because the text messages between Doe and Dr. Coleman do not constitute

conduct that a reasonable person could determine as so "severe, pervasive, and

objectively offensive that it effectively denied [Doe] equal access to [UNCG's] education

program or activity," UNCG was required by law to dismiss the Complaint against Dr.

Coleman but refused to do so for over 8 months.

135.     Rather than follow the law and dismiss Doe's deficient allegations, UNCG

purportedly spent more than 8 months conducting an unwarranted investigation until Dr.

Coleman's counsel notified UNCG of Dr. Coleman's intent to enforce his statutory and

constitutional rights via the instant suit and UNCG could no longer maintain its unlawful

investigative façade.

136.     UNCG's decision to dismiss the facially deficient Complaint only after

learning of Dr. Coleman's intent to file the instant suit illustrates the University's bias

against males; egoism; and indifference to due process and the University's legal

obligations under Title IX, 34 C.F.R. § 106.45(b)(3)(i) that mandates:

> If the **conduct alleged** in the formal complaint **would
> not constitute sexual harassment** as defined in §
> 106.30 **even if proved**, **[or] did not occur in the
> recipient's education program or activity** [ . . ] then
> the recipient **must dismiss the formal complaint** with

> regard to that conduct for the purposes of sexual
> harassment under title IX or this part[.]

(emphasis added).

137.     Dr. Coleman's counsel advised UNCG of this Title IX dismissal

provision—and of UNCG's obligation to dismiss the Complaint against Dr. Coleman

pursuant to this provision—in a letter sent 21 January 2021 (the "Policy Violation

Letter") wherein counsel detailed concerns with UNCG's handling of Dr. Coleman's

case. UNCG chose to ignore counsel's admonitions and continued its biased and

unlawful investigation. A copy of the Policy Violation Letter is attached as Exhibit X and

is detailed further herein.

138.     UNCG was also obligated to dismiss the Complaint under its own corollary

Title IX Policy 6.3.2 and its Formal Grievance Process policy, which policies state

respectively:

> 6.3.2 *Must Dismiss*: If the conduct alleged in the Formal
> Complaint (1) **would not constitute Sexual
> Harassment, even if proved**, (2) **did not occur in
> UNC Greensboro's education program or activity**,
> or (3) did not occur against a person in the U.S., **the
> Title IX Coordinator *will* dismiss the formal
> complaint** with regard to that conduct for the purposes
> of sexual harassment.

*See* Exhibit S (emphasis added).

> PRE-INVESTIGATION: If the University determines
> that the alleged conduct: 1. **does not constitute sexual
> harassment even if proved** [ . . . ] The University *will*
> **dismiss the formal complaint**[.]"

Case 1:21-cv-00723-CCE-LPA   Document 1   Filed 09/17/21   Page 41 of 100

UNCG Formal Grievance Process, p. 1 (emphasis added). A copy of the
UNCG Formal Grievance Process is attached as Exhibit T.

139.    Importantly, the Complaint states that Dr. Coleman sexually harassed Doe

"both on and off-campus,"[40] but the alleged conduct consisted entirely of remote

electronic communication. The Complaint does not explain how electronic

communication would be considered "on ***and*** off campus" or why the conduct does not

distinctly fall into either "on campus" or "off campus."

140.    The importance of this distinction is revealed by a careful reading of

UNCG's mandatory dismissal provision, reproduced in paragraph 138 above, that states

in pertinent part, "**If the conduct** alleged in the formal complaint [ . . . ] (2) **did not**

**occur in UNC Greensboro's education program or activity**, [ . . . ] **the Title IX**

**Coordinator** *will* **dismiss the formal complaint**[.]" (emphasis added). By not

distinguishing whether the text-message exchange was considered "on campus" or "off

campus", UNCG circumvented its own mandatory dismissal policy to continue pursuing

facially insufficient allegations of misconduct against Dr. Coleman.

141.    UNCG's failure to timely dismiss the Complaint as mandated exemplifies

its anti-male bias and disregard for fairness and due process.

142.    Not only does the Complaint against Dr. Coleman fail to allege conduct

sufficient to meet the definition of sexual harassment, it also fails to allege if or how Doe

was "effectively den[ied] equal access to the [University's] education program or

---

[40] See Exhibit C p.1.

activity" –a key element of sexual harassment under 34 C.F.R. § 106.3, supra ¶ 133. As detailed further below, at some point during the investigation Doe admitted to investigators that she had not been denied access to the University's education program or activity.

143.     The Complaint further fails to provide Dr. Coleman proper notice of the allegations against him pursuant to Title IX, as detailed below.

144.     34 C.F.R. § 106.45(b)(2)(B) requires recipient-schools provide the accused written notice of "the conduct allegedly constituting sexual harassment under §106.3" and if the recipient-school decides to investigate allegations that are not included in the original notice, "the recipient must provide notice of the additional allegations."

145.     UNCG's most obvious failure to notify is that, upon information and belief, the University never provided Dr. Coleman the Formal Complaint submitted by Doe— only the Notice of Allegations signed by Investigator/Coordinator Chappell. Dr. Coleman only realized the Notice of Investigation and the Formal Complaint were different documents through certain language used in the Dismissal Letter, detailed further below.[41]

146.     The first bullet point in the Notice of Investigation (referred to herein as the "Complaint") includes cherry-picked messages from Dr. Coleman and Doe's two-week text exchange, and last line of bullet point one states: "**and more** that made [Doe] uncomfortable." *See* Exhibit C, p. 1 (emphasis added).

---

[41] See "Dismissal Letter" attached as Exhibit Z.

43

147.     The statement "and more" indicates there is additional conduct being investigated that allegedly constitutes sexual harassment that is not included or described in the Complaint, but Dr. Coleman was never notified of any additional allegations against him in the more than 8-month-long "investigation".

148.     In addition to substantive notice of allegations, UNCG deprived Dr. Coleman of his right to receive advanced notice of investigative interviews with sufficient time to prepare, as mandated by 34 C.F.R. § 106.45(b)(5)(v) that provides:

> When investigating a formal complaint and throughout the grievance process, a recipient must – (v) Provide, to a party whose participation is invited or expected, written **notice** of the date, time, **location**, **participants**, and **purpose** of all hearings, **investigative interviews**, or other meetings, **with sufficient time for the party to prepare to participate**."

(emphasis added).

149.     To the extent Dr. Coleman's initial meeting with Defendant Gilliam on 14 December 2020 constituted an investigative interview, Dr. Coleman was not notified of this purpose, but instead was essentially ambushed by the Chancellor who demanded Dr. Coleman explain the Title IX allegations made against him before Dr. Coleman had seen the Complaint.

150.     In the University's continued disregard for both Dr. Coleman's rights and the Title IX Final Rule, UNCG only gave Dr. Coleman 47-48 hours' notice of his 16 December 2020 investigative interview with Coordinator/Investigator Chappell and investigator Jeanne Madorin ("Investigator Madorin").

151.     The Notice of Title IX Investigation Dr. Coleman received via email from Chappell at 1:00 p.m. on 14 December 2020 insisted Dr. Coleman choose between having the investigative interview on 16 December 2020 at 1:00 p.m. or 16 December 2020 at 2:00 p.m. *See* Exhibit C.

152.     Dr. Coleman had a fully booked calendar from 8:00 a.m. to 5:00 p.m. on 15 December and 16 December; he spent the 47–48-hour window searching for an attorney; coordinating the attorney's representation; trying to figure out how to print off the full message exchange; and absorbing the fallacious allegations. Dr. Coleman could not adequately prepare for the investigative interview on such short notice.

153.     UNCG further violated 34 C.F.R. § 106.45 by failing to identify the location, participants, and purpose of the investigative interview and by failing to even specify that it was an *investigative* interview. *See* Exhibit C, p. 3.

154.     Shortly after receiving the Notice of Title IX Investigation, Dr. Coleman had a phone call with Coordinator/Investigator Chappell wherein she explained they would go over the complaint processes and available resources for Dr. Coleman during the 16 December meeting. Based on this conversation Dr. Coleman believed the meeting was a preliminary meeting for outlining the Title IX process.

155.     In a follow-up call with Chappell the day before the scheduled meeting, Dr. Coleman specifically asked whether the 16 December meeting was a formal interview and Chappell stated that it was a formal interview and apologized to Dr. Coleman if she had given him the false impression during their phone call the day before that the 16

45

December meeting was just a preliminary meeting. Thus, Dr. Coleman had significantly less than 48-hours to prepare for the formal investigative interview on 16 December, as he was not fully aware of the nature, purpose, and significance of the interview until his call with Chappell on 15 December.

156.    Importantly, it was only six days after Dr. Coleman's 16 December investigative interview that Defendant Gilliam had his second meeting—the 22 December 2020 termination meeting wherein Defendant Gilliam weaponized the Title IX process against Dr. Coleman through threats, intimidation, and coercion to get Dr. Coleman to resign from the University, as detailed herein.

157.    Defendant Gilliam's second meeting marks a critical point when the Chancellor wrested control of the Title IX process—upon information and belief, with the support and/or acquiescence of Defendant Jackson-Newsom[42]—and issued his judgment that Dr. Coleman was responsible for the Complaint's allegations, thereby stripping Dr. Coleman of a fair and unbiased adjudication.

158.    Defendant Gilliam stated he spoke with Investigator/Coordinator Chappell and Investigator Madorin about terminating Dr. Coleman and, upon information and belief, Defendant Gilliam discussed Dr. Coleman's 16 December investigative interview with investigators Chappell and Madorin during their conversation.

---

[42] Defendant Jackson-Newsom is UNCG's Senior Title IX Administrator who is responsible for ensuring UNCG's Title IX process adheres to federal Title IX mandates.

159.     Upon information and belief, Defendant Gilliam purposefully told the Title IX investigators he was terminating Dr. Coleman based on the Complaint's allegations; expressed his anger to the investigators about being "embarrassed" by the allegations; and shared his concerns over the "great risk" the allegations posed to himself and the University.

160.     Upon information and belief, Defendant Gilliam intended to influence and interfere with the investigation by imposing his unilateral determination of responsibility and creating a conflict of interest for anyone involved in the investigation, knowing that subordinate employees may be less inclined to find Dr. Coleman "not responsible" if doing so meant they had to directly contradict the Chancellor's usurpation of the Title IX process/procedures.

161.     As University employees, Title IX coordinators and investigators are subordinates of Defendant Gilliam, and the members of the Chancellor's Council who would be involved as Title IX hearing panelists and/or decisions makers—including Senior Title IX Administrator Julia Jackson-Newsom and Associate Vice Chancellor/Chief Human Resources Officer and Title IX Investigator Jeanne Madorin— were, upon information and belief, directly involved in Dr. Colman's termination and in crafting the Termination Announcement.

162.     Upon information and belief, Defendant Gilliam's conduct influenced investigators to unjustifiably extend their "investigation" for over 8 months rather than

promptly dismiss the Complaint for failing to allege conduct that meets the definition of sexual harassment under Title IX or UNCG's corollary Title IX policy.

163.     The Chancellor's 22 December 2020 meeting reveals UNCG's abuses of the Title IX process that include: predetermining Dr. Coleman's responsibility; imposing disciplinary sanctions against Dr. Coleman prior to conclusion of the grievance process and prior to a determination of responsibility pursuant to the grievance process; retaliation against Dr. Coleman; and setting the stage for an unwarranted, biased and conflict-riddled 8-month-long investigation.

164.     At this 22 December meeting, Defendant Gilliam unequivocally announced his predetermination of Dr. Coleman's responsibility by repeatedly stating he was terminating Dr. Coleman "*for cause*" and specifically because, in his opinion, the text-exchange conduct alleged in the Complaint "*crossed the line*."

165.     The Chancellor's actions violate clearly established Title IX policy requiring recipient schools to follow a grievance process that:

> **Treat**[s] **complainants and respondents equitably** [ . . . ] by following a grievance process that complies with this section **before the imposition of any disciplinary sanctions** or other actions that are not supportive measures as defined in § 106.30 **against a respondent**. [ . . . ] [that] **avoids prejudgment of the facts** at issue [ . . . ] [and that] **include[s] a presumption that the respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process**.

34 C.F.R. § 106.45(b) (emphasis added).

166.     This rule is further codified in UNCG's own Title IX Policy 7.7 that states:

48

PRESUMPTION OF NON-RESPONSIBILITY AND
PARTICIPATION BY THE PARTIES

The investigation is a **neutral**, fact-gathering **process**. The **respondent is presumed to be not responsible**; this presumption may be overcome only where the decision maker(s) and/or Hearing Panel conclude that there is sufficient evidence, by a Preponderance of the Evidence, to support a finding that the respondent violated the Policy.

Exhibit S, p. 12, Section 7.7 (emphasis added); *see also* UNCG's Formal Grievance Policy, p.2, attached as Exhibit T.

167.    Defendant Gilliam's Termination Announcement asserting Dr. Coleman was terminated for ***"behavior that did not meet expectations for senior leaders at UNCG"***—which he published only nine (9) days into the investigation—demonstrates that Defendant Gilliam pre-determined Dr. Coleman's responsibility based solely on the allegations and before completion of the grievance process or any meaningful investigation of the allegations.

168.    Further, by publishing his prejudgment of Dr. Coleman's responsibility, Defendant Gilliam created a conflict of interest for his subordinate Title IX administrators because any final determination finding Dr. Coleman "not responsible" would undermine the Chancellor's judgment and public announcement of the Chancellor Gilliam's termination of Dr. Coleman.

169.    Upon information and belief, Defendant Gilliam's published pre-judgment caused investigators to delay dismissing the complaint—as they were required to do under Title IX—and extend their unsubstantiated investigation for over 8 months.

49

170.     Throughout the Title IX investigation and procedures, Dr. Coleman was

entitled to a presumption of non-responsibility and Defendant Gilliam deprived him of

that presumption by manufacturing conflicts of interest intended to preclude the

possibility of Dr. Coleman receiving a prompt, fair, and unbiased adjudication of the Title

IX allegations against him.

171.     By terminating Dr. Coleman because he was the subject of a Title IX

complaint, and by threatening, intimidating, and coercing Dr. Coleman to resign,

Defendant Gilliam unlawfully retaliated against Dr. Coleman in violation of 34 C.F.R. §

106.71 that states:

> *Retaliation prohibited*. No recipient or other person
> may **intimidate**, **threaten**, **coerce**, **or discriminate
> against any individual** for the purpose of interfering
> with any right or privilege secured by title IX or this part
> [ . . . ] **Intimidation**, **threats**, **coercion**, or
> **discrimination**, **including charges against an
> individual for code of conduct violations that do not
> involve sex discrimination or sexual harassment, but
> arise out of the same facts or circumstances as a**
> report or complaint of sex discrimination, or a **report
> or formal complaint of sexual harassment**, for the
> purpose of interfering with any right or privileged
> secured by title IX or this part, **constitutes retaliation**.

 (emphasis added).

172.     The Chancellor's retaliatory termination of Dr. Coleman as Provost based on

the Title IX allegations[43] and before a final determination of responsibility deprived Dr.

---

[43] As detailed in ¶¶ 70-86; and 156-64, above, in terminating Dr. Coleman, the Chancellor stated that the Title IX allegations—Dr. Coleman's correspondence with Doe —had "crossed a line" and told Dr. Coleman he consulted with the Title IX investigators in deciding to terminate Dr. Coleman as provost.

Coleman his right to a presumption of non-responsibility; impeded the Title IX process; and contributed to the University's unlawful gender-bias against Dr. Coleman.

173.     UNCG's discriminatory treatment only worsened after Dr. Coleman's termination.

174.     Dr. Coleman's counsel sent a letter to UNCG's Title IX Coordinator and Title IX Investigator, Murphie Chappell ("Investigator/Coordinator Chappell" or "Chappell")[44] on 7 January 2021. Counsel's letter to Chappell is attached as Exhibit U; complainant's name has been redacted to protect confidentiality, but the letter has not been otherwise altered.

175.     Counsel's letter sought clarification regarding UNCG's Title IX policies and UNCG's apparent disregard of those policies in its investigation. The letter informed Chappell of counsel's concerns with biased and otherwise improper conduct in the University's Title IX investigation, and particularly with regard to: Chappell's dual role as Title IX Coordinator and Investigator; the investigative information communicated to Defendant Gilliam following Chappell's 16 December 2020 investigative interview of Dr. Coleman and prior to the Chancellor's termination of Coleman as provost; that the Title IX complaint against Dr. Coleman warranted mandatory dismissal under Title IX §106.45(b)(2)(B)(ii) and UNCG's corollary Title IX Policy section 6.3.2; the negative impact of Defendant Gilliam's Termination Announcement on Dr. Coleman's ability to

---

[44] Murphie Chappell also presently serves as Director for the UNCG Campus Violence Response Center: https://cvrc.uncg.edu/cvrc-staff/ .

receive a fair and impartial adjudication; and inquiring as to the purpose and logistics of scheduling a second investigative interview of Dr. Coleman. *See* Exhibit U, pp. 1-2.

176.     Chappell sent Dr. Coleman's counsel an email that did not address the issues raised in counsel's letter. A copy of Chappell's email is attached as Exhibit V.

177.     On 14 January 2021 Special Deputy Attorney General Kimberly Potter ("Potter") responded to counsel's letter to Chappell (the "Potter Letter"). A copy of the Potter Letter is attached as Exhibit W.

178.      In addressing counsel's assertion that the Title IX 2020 Amendments precluded individuals from serving in two roles (e.g. Chappell serving as coordinator and investigator), the Potter Letter stated that Dr. Coleman "was provided an opportunity to object to either Ms. Chappell or Ms. Madorin's[45] role as investigators on or around December 14, 2020 [the day Dr. Coleman received the Notice of Title IX Investigation and No-Contact Order] and ***did not do so***" and praised Chappell and Madorin's "more [than] [*sic*] thirty-five years of combined experience as Human Resource, legal or investigative professionals." Exhibit W p. 2, emphasis added.

179.     The Potter Letter did not cite statutory authority or policy provisions for Potter's contention that a respondent must assert his or her rights to an unbiased investigation the day the respondent receives notice of a Title IX complaint to avoid waiver of those rights, and Potter's suggestion that Dr. Coleman waived his rights to an

---

[45] Jeanna Madorin is Associate Vice Chancellor for Human Resources, in addition to being a Title IX Investigator in Dr. Coleman's case along with Murphie Chappell (Title IX Coordinator, Title IX Investigator, and Director of UNCG's Campus Violence Response Center).

unbiased investigation coupled with her defensive posturing about the investigators' professional experience reflects righteous indignation more than fair and equitable adjudication.

180.    Regarding the purpose of a second investigative interview, the Potter Letter stated that "Title IX and University policies require that each employee cooperate with an investigation[.]" Exhibit W, p. 1. This is discordant with UNCG's Title IX Policy section 7.7 that states in pertinent part:

> **Neither party is required to participate in the investigation** or in any form of resolution under these procedures, and the **Investigator(s) will not draw any adverse inference from a decision by either of the parties not to participate.**

Exhibit S (emphasis added).

181.    Potter's statement also ignores the mandate of 34 C.F.R. § 106.71 that states:

> **No recipient or other person may intimidate, threaten, coerce, or discriminate against any individual** for the purpose of interfering with any right or privilege secured by title IX or this part, or **because the individual** [ . . . ] **participated or refused to participate in any manner in an investigation proceeding**[.]

(emphasis added).

182.    Potter's letter made further inaccurate representations by suggesting Dr. Coleman is responsible for providing exculpatory evidence:

> [T]he University plans to reach out to your client [ . . . ] to **provide any information that he believes would be pertinent to the inquiry**. Please know that [*sic*] University

> **will continue its investigation and reach a determination based on the information provided**.

*See* Exhibit W, p.1 (emphasis added).

183. Potter's statement is contrary to the Title IX Final Rule and UNCG's

corollary Formal Grievance Process Policy regarding evidence gathering.

184. 34 C.F.R. § 106.34(b)(5) states:

> *Investigation of formal complaint.* When investigating a formal complaint and throughout the grievance process, a recipient must –(i) **Ensure that the burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility rest on the recipient and not on the parties**[.] (emphasis added).

185. Similarly, UNCG's Formal Grievance Process provides:

> **The burden of proof and burden of gathering evidence** sufficient to reach a determination regarding responsibility **rests on the University**, not on the parties.

Exhibit T, p. 2, § 1 (emphasis added).

186. The Potter Letter summarily dismissed counsel's concern that Defendant

Gilliam's Termination Announcement would cultivate a biased university atmosphere

depriving Dr. Coleman of his due process rights under Title IX, stating:

> Finally your contention that the Chancellor's statement to explain the reason for your client's removal as Provost was inaccurate or defamatory, and has created an environment that prevents the appointment of an impartial panel, is without merit. Simply, your client's conduct did not meet the Chancellor's expectations for his senior leadership team members, and the Chancellor notified him of such, sought an explanation, found it unpersuasive and acted within his authority to return your client to his faculty position.

Exhibit W, p. 2.

54

187.     Potter's statement inaccurately portrays the Chancellor's actions and public statement, as the Termination Announcement did not state Dr. Coleman's behavior was not up to **the Chancellor's standards**; rather it expressly stated that Dr. Coleman was removed as Provost "due to **behavior that did not meet expectations for senior leaders at UNCG**,"[46] implying a violation of policy rather than of Defendant Gilliam's personal preferences. *See* Exhibit H.

188.     Dr. Coleman was never told what specific "expectation" UNCG has for administrators that he allegedly violated, and upon information and belief, UNCG does not have a written policy or document outlining the behavioral "expectations for senior leaders at UNCG", nor is there any UNCG policy prohibiting administrators from having platonic or mentoring relationships with faculty.

189.     Potter's letter concluded with a final misstatement of applicable procedure by advising Dr. Coleman's counsel to "please direct all future correspondence regarding your client and the current situation to me[.]"

190.     Potter's stated communication restriction flouts the mandates of 34 C.F.R. § 106.45(b)(5)(iii) that states:

> *Investigation of formal complaint*. When investigating a formal complaint and throughout the grievance process, a **recipient must**—(iii) *Not* **restrict the ability of either party to discuss the allegations under investigation**[.]

---

[46] *See* Exhibit H (emphasis added).

Case 1:21-cv-00723-CCE-LPA   Document 1   Filed 09/17/21   Page 55 of 100

191.     On 21 January 2021 Dr. Coleman's counsel sent a response letter to Potter ("Policy Violation Letter" attached as Exhibit X)[47] detailing the Title IX policy violations observed thus far in UNCG's investigation of Doe's complaint against Dr. Coleman and the biased conduct undermining Dr. Coleman's due process rights.

192.     Importantly, the Policy Violation Letter informed Potter that Doe's allegations against Dr. Coleman based on their text message exchange did not constitute sexual harassment and must be dismissed pursuant to Title IX's mandatory dismissal provision.[48]

193.     Potter acknowledged receipt of counsel's Policy Violation Letter but did not otherwise respond.

194.     Dr. Coleman participated in a second investigative interview with investigators Chappell and Madorin on 1 April 2021.[49]

195.     During this interview Dr. Coleman learned for the first time that investigators did not have a copy of the full text message exchange between him and Doe; Dr. Coleman sent the full text exchange to investigators immediately after the meeting.

---

[47] Please note the complainant's name has been redacted from the Policy Violation Letter to protect her confidentiality, but the letter has not been otherwise altered.
[48] *See* Exhibit X, p.2.
[49] This interview was initially scheduled for 8 January 2021 but Dr. Coleman's counsel rescheduled the interview, that was then further postponed to 19-March-2021 due to the death of Dr. Coleman's mother on 13-February-2021 and his out-of-state responsibilities arising from her death. The 19-March-2021 interview then had to be rescheduled to 1-April-2021 because of Dr. Coleman's counsel's medical emergency.

196.     UNCG did not contact or otherwise communicate with Dr. Coleman regarding the Title IX investigation for the next 153 days.

197.     Dr. Coleman's counsel sent a draft of this complaint and a Rule 408 demand to Special Deputy Attorney General Potter on 20 August 2021 advising Dr. Coleman intended to file the instant suit within 48-hours unless mutually agreeable terms could be reached.

198.     48-hours is more time than Defendant Gilliam gave Dr. Coleman to decide between resignation or public disgrace via the Termination Announcement.

199.     At Potter's request, Dr. Coleman's counsel agreed to allow UNCG until 2 September 2021 to respond before filing suit.

200.     Dr. Coleman's counsel conditioned the filing extension upon UNCG's agreeance to not jump-start the stagnant Title IX investigation in the interim.

201.     This condition notwithstanding, Coordinator/Investigator Murphie Chappell emailed Dr. Coleman on 31 August 2021 requesting a meeting with Dr. Coleman on Wednesday 1 September 2021. Chappell did not copy Dr. Coleman's counsel on the email. A copy of Coordinator/Investigator Chappell's 31 August 2021 email is attached as Exhibit AA.

202.     Dr. Coleman and his counsel met with Coordinator/Investigator Chappell and Investigator Madorin via Zoom on 1 September 2021—one day before Dr. Coleman intended to file this suit.

57

203. Coordinator/Investigator Chappell began the meeting by announcing that UNCG was dismissing the Title IX Complaint against Dr. Coleman and sent a formal dismissal letter (the "Dismissal Letter") via email for review. A copy of the Dismissal Letter is attached as Exhibit Z.[50]

204. The Dismissal Letter's parsimonious language, lack of details, and repeated misstatements of applicable Title IX provisions belies the University's reluctance to comply with Title IX policy requiring dismissal of Doe's Complaint against Dr. Coleman.

205. Title IX includes both a mandatory and a permissive dismissal provision.

206. Dismissal is mandatory under Title IX if:

> [T]he conduct alleged in the formal complaint would not constitute sexual harassment as defined in § 106.30 even if proved, did not occur in the recipient's education program or activity, or did not occur against a person in the United States, then **the recipient must dismiss the formal complaint** with regard to that conduct[.]" (emphasis added).[51]

207. Title IX permits recipients to dismiss the formal complaint if:

> [A]t any time during the investigation or hearing: A complainant notifies the Title IX Coordinator in writing *that the complainant would like to withdraw the formal complaint* or any allegations therein; the *respondent is no longer* enrolled or *employed by the recipient*; or *specific circumstances prevent the recipient from gathering*

---

[50] Please note the Dismissal Letter has been redacted to protect the complainant's identity but has not been otherwise altered.
[51] 34 C.F.R. § 106.45(b)(3)(i).

> *evidence sufficient to reach a determination* as to the formal
> complaint or allegations therein.[52]

208.    The Dismissal Letter does not indicate that any of the permissive dismissal circumstances under Title IX apply to Doe's Complaint, such as that Doe "withdrew the formal complaint" or that "specific circumstances prevented [UNCG] from gathering evidence sufficient to reach a determination" and the only remaining permissive dismissal factor is inapplicable because Dr. Coleman is still presently employed by UNCG as a tenured biology professor.

209.    Although it does not reference any of the permissive dismissal circumstances as the basis for its dismissal, the Dismissal Letter misstates the applicable Title IX definition of sexual harassment[53] by using language from the permissive dismissal provision regarding sufficient evidence, stating:

> Based on the *information available* from the Investigation, the University *does not have sufficient facts to demonstrate that the sexual harassment* alleged in the Formal Complaint *reaches the level of being* so severe, **persistent**, and pervasive, as defined by 34 CFR 106.30, that it limited [Doe's] access to UNC Greensboro's programs and activities. Therefore, the University is dismissing the Formal Complaint under Title IX."[54] (bolding in original, italics added).

---

[52] 34 C.F.R. § 106.45(b)(3)(ii).
[53] 34 C.F.R. § 106.3(a)((2) states: "Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity[.]"
[54] See Exhibit Z, p.2.

59

210.     This statement omits the Title IX definition language "determined by a reasonable person" and "objectively offensive" and the Dismissal Letter erroneously adds the word "persistent" that is not in Title IX's sexual harassment definition.

211.     The Dismissal Letter also misstates the Title IX sexual harassment definition in evaluating Doe's access to UNCG's education program or activity by omitting the Title IX definition language "on the basis of sex, determined by a reasonable person":

> With regard to whether the reported unwelcome conduct [Doe] experienced was ***so severe, pervasive, and objectively offensive*** that it effectively denied [Doe's] access to UNC Greensboro's education program or activity[.]"[55]

212.     The Dismissal Letter states UNCG's decision was "[b]ased on a thorough, objective evaluation of all relevant evidence available[,]"[56] but does not describe what evidence was evaluated other than a passing reference to "multiple interviews with parties and witnesses."[57]

213.     The other "witnesses" are not named in the letter and were not otherwise provided to Dr. Coleman.[58]

214.     The Dismissal Letter further states the only evidence related to whether Doe was denied access to UNCG's education program or activity as a result of the

---

[55] See Exhibit Z pp. 1-2.
[56] See Exhibit Z p. 1.
[57] See Exhibit Z, p. 2.
[58] See generally Exhibit Z.

alleged text message communication with Dr. Coleman was Doe's "statement in the investigation that she was job searching. However, Doe also said she was open and looking into opportunities before this started; this incident just escalated her inquiries."[59]

215.     The Dismissal Letter does not explain whether Doe made these statements at the same time, but—in addition to UNCG's obligation to dismiss the Complaint for not alleging sexual harassing conduct under Title IX's definition—UNCG was obligated to immediately dismiss the Complaint against Dr. Coleman when it learned that Doe was not denied access, because being denied "equal access to the recipient's education program or activity" is an essential element of Title IX's definition of sexual harassment under 34 C.F.R.§ 106.3.

216.     The Dismissal Letter concludes by warning Dr. Coleman that UNCG "will be reviewing the investigative findings consistent with the 'Policy on Discriminatory Conduct' and 'Unlawful Workplace Harassment Policy and Plan' in order to determine if additional action is warranted."[60]

217.     Investigator/Coordinator Chappell did not mention this continued investigation of Dr. Coleman during the 1 September 2021 meeting but stated the "No Contact Order"[61] Dr. Coleman received with the Notice of Investigation on 14 December 2020 would remain in place and that it was a mutually applicable order.

---

[59] See Exhibit Z p. 2.
[60] See Exhibit Z, p. 2.
[61] Attached as Exhibit C.

218.     When prompted about when UNCG decided to dismiss the Complaint against Dr. Coleman, Investigator/Coordinator Chappell admitted during the meeting that the decision was made as of the date on the Dismissal Letter—1 September 2021.

219.     UNCG initiated the Formal Complaint process based upon insufficient allegations of sexually harassing conduct on 14 December 2020; upon information and belief, UNCG failed to initially obtain the full message exchange from Doe and only acquired the full message exchange after its second investigative interview of Dr. Coleman on 1 April 2021; at some point in the investigation UNCG ascertained that Doe's allegations against Dr. Coleman were fatally deficient because Doe admitted she was not denied access to UNCG's education program or activity but thereafter UNCG still refused to dismiss the Complaint as mandated; UNCG dismissed the Complaint against Dr. Coleman 12 days after receiving Dr. Coleman's draft complaint and Rule 408 demand, 1 day before Dr. Coleman intended to file the instant suit, and 153 days after his second investigative interview—without any communication regarding the investigation in the interim.

220.     UNCG knew it was obligated to dismiss the Formal Complaint—or otherwise not initiate the formal grievance process—pursuant to Title IX when it learned of Doe's insufficient allegations in December 2020. UNCG chose not to.

221.     UNCG knew it was obligated to dismiss the Complaint by at least 21 January 2021 when Dr. Coleman's counsel sent the Policy Violation Letter detailing why

the University must dismiss the Complaint for failing to allege conduct that constituted sexual harassment under Title IX's definition. UNCG chose not to.

222.    UNCG knew it was obligated to dismiss the complaint by at least 1 April 2021 when it received the full text message exchange between Doe and Dr. Coleman, which exchange revealed the cherry-picked text messages did not constitute sexual harassment. UNCG chose not to.

223.    UNCG knew it was obligated to dismiss the Complaint when it learned during the investigation that Doe was not denied access to the University's education program or activity as a result of any conduct by Dr. Coleman. UNCG chose not to.

224.    UNCG knew Dr. Coleman would file suit by 2 September 2021 to enforce his rights under Title IX and to hold UNCG accountable for its derelict process. UNCG chose to dismiss the Complaint against Dr. Coleman on 1 September 2021.

225.    As a result of UNCG's unlawful and sexually-biased conduct, Dr. Coleman was retaliated against via termination and public malignment within two weeks of the initial fallacious allegations, and Dr. Coleman endured a 261-day spurious investigation during which he was denied more than 20 jobs opportunities—many of which explicitly stated he was denied the position because of the negative press surrounding the Title IX investigation—and throughout the entirety Dr. Coleman was never provided any evidence or other investigative information, nor was he given any reason for UNCG's delayed adjudication.

## V. How UNCG treats female employees accused of sexual misconduct

226.     Denise Gabriel ("Gabriel") was a tenured theater professor at UNCG from 2009 until her resignation from the University in January 2021. Gabriel resigned from UNCG after the school concluded its investigation of several complaints against Gabriel alleging the professor sexually abused several students.[62]

227.     Dr. Coleman has personal knowledge of certain facts and circumstances regarding UNCG's response to and handling of the sexual misconduct complaints against Gabriel because he was acting Provost at the time. Any statements that Dr. Coleman does not have personal knowledge of are alleged and prefaced upon information and belief, except for statements based on information from a *Triad City Beat* news article, and those statements include citations to the article.

228.     In August of 2020, UNCG received several sexual misconduct complaints against Gabriel by former students, including allegations that Gabriel engaged in inappropriate and unconsented-to physical contact with them when they were still enrolled at UNCG.

229.     The *Triad City Beat* published an article on 22 January 2021 that included excerpts from victims' written statements recounting Gabriel's alleged abuse.[63] A copy of the article is attached as Exhibit Y.

---

[62] In addition to sexual misconduct complaints, Gabriel was alleged to have engaged in bullying and racist conduct toward students.

[63] *See Triad City Beat* article UNCG theater professor resigns following accounts of abuse by former students, published 22 January 2021, available by the following link: https://triad-city-beat.com/uncg-theater-professor-resigns-abuse/ (last accessed 3 August 2021); a copy of the article is attached as Exhibit Y.

64

230. One former student—Claudia H. Stein ("Stein")—alleged Gabriel sexually abused her during her sophomore year.[64] Gabriel took Stein out to dinner. After dinner, Gabriel took Stein to her house and had Stein shower and lie down on a massage table dressed in only her bra and underwear.[65] Gabriel then performed a full body massage on Stein.[66] During the massage, Gabriel "touched every inch of [Stein's] body, moaning at points while doing so."[67]

231. Stein stated she and approximately six other alleged victims had a Zoom call with UNCG Title IX Investigator/Coordinator Chappell to discuss their allegations against Gabriel.[68]

232. UNCG did not terminate Gabriel when it received these complaints, nor did UNCG place Gabriel on administrative leave during the investigation—an option provided for in the Title IX Policy.[69] Upon information and belief, Defendant Gilliam did not prejudge Gabriel responsible based on the Title IX complaint(s) against her, nor did he circumvent her right to a Formal Grievance process by disseminating a decretal judgment amongst subordinate administrators or issuing a stigmatizing public judgment and sanction—Defendant Gilliam did not personally involve himself at all in the investigation or adjudication of the complaints against Gabriel, nor did he bully or threaten Gabriel with public statements to coerce her to resign.

---

[64] *See* id.
[65] *See* id.
[66] *See* id.
[67] *See* id.
[68] *See* id.
[69] *See* 34 C.F.R. § 106.44(b)(2)(d).

233.     Rather, UNCG conducted a full investigation that, upon information and belief, respected Gabriel's due process and statutory Title IX rights and was not biased against her based on her female sex—though, UNCG's respect of Gabriel's Title IX rights may have been motivated by its pro-female bias. UNCG allowed Gabriel to continue teaching students throughout the investigation and made a determination of her responsibility based on the full investigation's findings in accordance with its obligations under Title IX.

234.     After determining Gabriel responsible for sexual misconduct, UNCG administrators consulted and—based on the investigation results—decided termination was the appropriate sanction. UNCG offered Gabriel the opportunity to retire in leu of termination and provided Gabriel the option of appealing her termination if she chose not to resign. UNCG even arranged for Gabriel to be given an off-campus teaching assignment while her appeal was pending.

235.     Unlike Dr. Coleman—who was given less than twenty-four hours to "decide" between pre-judged public statements or resignation—UNCG gave Gabriel approximately two weeks to choose between termination, appeal, or resignation. Gabriel opted to resign from UNCG.

236.     Following Gabriel's resignation, UNCG did not issue a public statement condemning her for misconduct, despite Gabriel's culpability and the *Triad City Beat* article detailing the myriad allegations against Gabriel. Rather, UNCG School of Theatre Director, Natalie Sowell, sent a university-wide email announcing Gabriel's resignation

and praising Gabriel for her beneficial impact on the university, stating, "Professor Gabriel's 10+ years with the School of Theatre have ***benefitted a great many students*** and the school as a whole. ***She will be missed***." *See* Exhibit Y, p. 2 (emphasis added).

237. Upon information and belief, UNCG has never publicly commented on the Gabriel's misconduct, and declined *Triad City Beat's* request for information, stating: "we cannot comment on specifics related to personnel issues."[70] UNCG has issued generalized statements of moral preening that it "takes very seriously [its] mission to provide an equitable, inclusive and accessible learning and working environment for all of [its] students and employees" and that UNCG is "making the culture and climate a top priority."[71]

238. None of UNCG's public statements directly mention Gabriel, and such statements are apparently not even available through a simple internet Google search using the terms "Denise Gabriel" and "UNCG". In fact, the only information produced in a search using those terms are the *Triad City Beat* article, a *Greensboro News & Record* article[72] published 26 January 2021 that is restricted to website subscribers, and a webpage titled "Academic Sexual Misconduct Database" that provides general statistical information and reference to the *Greensboro News & Record* subscriber-restricted article.[73]

---

[70] *See* Exhibit Y.
[71] *See id.*
[72] The *Greensboro News & Record* article is not viewable by non-subscribers, but the article page is available through the following link: https://greensboro.com/news/local/education/report-uncg-theater-professor-retires-amid-misconduct-allegations/article_25139350-5f5b-11eb-b296-675643eb3dc5.html (last accessed 3 August 2021).
[73] *See* https://academic-sexual-misconduct-database.com/person/denise-gabriel (last accessed 3 August 2021).

239.     In contrast, a Google search using the terms "Jim Coleman" and "UNCG" produces numerous publications and social media websites reciting Defendant Gilliam's Termination Announcement statements that UNCG "removed Jim Coleman from the office of provost due to behavior that did not meet expectations for senior leaders at UNCG." These publications are discussed in detail above, ¶¶ 93-107. The readily accessible nation-wide coverage is so extensive that Dr. Coleman has been advised by recruiting companies to not even bother applying for positions because, as a search consultant for Boise State University put it, "a quick google search will point to negative information which will put in question your candidacy." *See* attached Exhibit O; *see also* ¶111, above.

240.     Denise Gabriel is a similarly situated individual to Dr. Coleman as she is in her sixties, was a tenured professor employed by UNCG, and has a nation-wide professional reputation and decades-long career.

241.     Like Dr. Coleman, Gabriel was accused of sexual misconduct by a female complainant and the allegations against Gabriel fell under the University's Title IX purview, such that UNCG was obligated to presume Gabriel "not responsible" for the alleged conduct and to follow a fair and impartial grievance process in evaluating, investigating, and determining Gabriel's responsibility prior to taking disciplinary action against her.

242.     Unlike Dr. Coleman, Gabriel was presumed not responsible and her Title IX process was handled with the upmost discretion by UNCG, who not only refrained

68

from publicly condemning Gabriel—either before or after her Title IX process was resolved—but refused comment when directly questioned by a reporter about the allegations.[74]

243.     Unlike Dr. Coleman, Gabriel was not terminated or sanctioned by UNCG or Defendant Gilliam because of the allegations, but was afforded a full, unbiased investigation and continued in her employment without disruption throughout the investigation.

244.     Unlike Dr. Coleman, UNCG based its determination of Gabriel's responsibility on the results of a full and impartial investigation and decided to terminate Gabriel only after it found Gabriel responsible. Even then, UNCG provided Gabriel the option of appealing her sanction and continuing her employment pending appeal. Further, UNCG offered Gabriel the option of resigning in leu of termination and allowed her two weeks to consider and decide.

245.     Finally, after UNCG concluded Gabriel's Title IX process and Gabriel tendered her resignation, and after the allegations against Gabriel were publicly disseminated by *Triad City Beat*: UNCG did not publicly condemn Gabriel or her sexual misconduct; instead, the University issued a statement about Gabriel's positive impact on UNCG students and said that Gabriel would "*be missed.*" *See* Exhibit Z.

246.     Denise Gabriel is a female; Dr. Coleman is a male.

---

[74] *See* Exhibit Y.

Case 1:21-cv-00723-CCE-LPA   Document 1   Filed 09/17/21   Page 69 of 100

247.     Denise Gabriel was found responsible after a 4-month investigation; the Complaint against Dr. Coleman was dismissed after a nearly 9-month-long "investigation".

## VI. Damages

248.      Before 14 December 2020, Dr. Coleman spent decades working in academia, education institutions, and working to ensure that no student faced artificial barriers to success based on their immutable traits or socio-economic status.

249.     Before 14 December 2020, Dr. Coleman was highly respected and an accomplished member of his professional field without a scintilla of misconduct on his record.

250.     Before 14 December 2020, Dr. Coleman believed UNCG aligned with his principles and that he could make positive differences in students' lives through his role as Provost.

251.     Before 14 December 2020, Dr. Coleman was happily building a life in North Carolina with his wife of 22 years and was excited to join the UNCG community.

252.     In the months following 14 December 2020, Dr. Coleman: was insulted, terminated, and scorned by his employer; was publicly and viciously maligned; was subjected to a biased and unlawful months-long pending investigation; was abandoned by his peers and colleagues and forced to mourn the death of his mother without community support; and was stigmatized in the national higher education community where he has since been rejected from more than 20 potential job opportunities—all of this without

70

ever being found responsible for alleged sexual harassment stemming from a two-week platonic text message exchange.

253.    Dr. Coleman has been damaged by the wrongful, knowing, intentional, and/or recklessly indifferent conduct of the defendants in an amount in excess of $25,000.00.

254.    Upon information and belief, UNCG has purchased one or more policies of liability insurance and has therefore waived immunity for claims against the University and against defendants Gilliam and Jackson-Newsom in their official capacities.

**FIRST CLAIM FOR RELIEF**
**TITLE IX SEX DISCRIMINATION**
**Against UNCG, Defendant Gilliam and Defendant Jackson-Newsom in their official capacities**

255.    Dr. Coleman realleges and incorporates the allegations of paragraphs 1 through 254 as if fully set forth herein.

256.    Plaintiff invokes this Court's original jurisdiction under Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

257.    Title IX of the Education Act Amendment of 1972, 20 U.S.C. § 1981, et. seq. ("Title IX") provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

71

258.     UNCG is Dr. Coleman's employer and is subject to Title IX because it receives federal funding.

259.     Title IX is enforceable through an implied private right of action affording an individual discriminated against due to his gender damages and equitable relief.

260.     Courts have recognized violations of reverse Title IX claims under several theories including erroneous outcome, selective enforcement, and the "plausible inference test" recently adopted by the Fourth Circuit.[75]

261.     Dr. Coleman makes a claim of discrimination under the selective enforcement and plausible inference theories.

262.     Pursuant to the Title IX Final Rule, notice to a Title IX Coordinator or to any official with "authority to institute corrective measures on behalf of the recipient" charges a recipient-school with *actual knowledge* and triggers the recipient-school's response obligations, including its obligation to follow a Title IX formal grievance process specified by the Final Rule. *See* 34 C.F.R. §§ 106.30(a); 106.44; and 106.45.

263.     Defendant Gilliam and Defendant Julia Jackson-Newsom were UNCG-designated "officials with authority" at all relevant times.[76]

264.     UNCG also designates the following individuals as "officials with authority": Coordinator/Investigator Chappell (as Title IX Coordinator); Investigator

---

[75] *See Malcolm X. Sheppard v. The Visitors of Virginia State University, et. al.*, No. 19-2452, at 9-10, 2021 WL 1227809 (4th Cir. 2021) (adopting the plausible inference test that asks "do the alleged facts, if true, raise a plausible inference of gender discrimination?").

[76] *See* UNCG's Title IX webpage titled "Title IX UNC Greensboro, Employee Reporting Obligations, Officials with Authority" available at: https://titleix.uncg.edu/employee-reporting-obligations/ (last accessed 23 July 2021).

Jeanne Madorin (as Associate Vice Chancellor for Human Resources); Jerry Blakemore (as UNCG General Counsel); and Kristen Bonatz (as UNCG Deputy General Counsel).[77]

265. Defendant Gilliam was Dr. Coleman's direct supervisor and was personally involved in perpetrating the discriminatory practices against Dr. Coleman as described herein.

266. Defendant Julia Jackson-Newsom was UNCG's Senior Title IX Administrator in charge of overseeing the University's compliance with federal Title IX mandates; Defendant Jackson-Newsom was a member of the Chancellor's Council and was Defendant Gilliam's subordinate and direct report.

267. Defendant Gilliam and his subordinates—including Defendant Jackson-Newsom—acted under color of state law in discriminatorily enforcing the University policies and procedures under their control, as Defendant Gilliam approved UNCG's official Title IX Policy on 10 August 2020 and Defendant Jackson-Newsom is responsible for the implementation of UNCG's official Title IX Policy.[78]

268. The Department of Education's Final Rule[79] explicitly extends Title IX protection to respondents: "*Discrimination on the basis of sex.* A recipient's treatment of a complainant or a respondent in response to a formal complaint of sexual harassment

---

[77] *See id.*
[78] *See* UNCG Title IX Policy attached as Exhibit S and available via the following link: https://policy.uncg.edu/university_policies/title-ix-policy/ (last accessed 23 July 2021).
[79] Nondiscrimination on the basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance ("Final Rule"), 85 Fed. Reg. 30,026-01; codified at 34 C.F.R. Part 106; *see also* § II, ¶¶ 33-54, above, for a detailed analysis of Title IX.

Case 1:21-cv-00723-CCE-LPA   Document 1   Filed 09/17/21   Page 73 of 100

may constitute discrimination on the basis of sex under title IX." 34 C.F.R. § 106.45(a) (italics in original).

269. Title IX requires recipient-schools to implement and follow a grievance policy that:

> **Treat**[s] **complainants and respondents equitably** [ . . . ] by following a grievance process that complies with this section **before the imposition of any disciplinary sanctions** or other actions that are not supportive measures as defined in § 106.30 **against a respondent**. [ . . . ] [that] requires an objective evaluation of all relevant evidence—including both inculpatory and exculpatory evidence—and provide that credibility determinations may not be based on a person's status as a complainant. [ . . . ] [that] **avoids prejudgment of the facts** at issue [ . . . ] [and that] **include[s] a presumption that the respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process**.

34 C.F.R. § 106.45(b) (emphasis added).

270. Based on the foregoing averments of fact, Defendant UNCG has deprived Dr. Coleman, on the basis of his male sex, of his Title IX rights, his statutory and constitutional due process rights, and equal protection of the laws through the intentional and unlawful sex-based application of its policies for handling sexual harassment allegations, which led to the selective enforcement against Dr. Coleman in this matter.

271. UNCG initiated and conducted the formal Title IX Grievance Process [80] in a manner that was biased against Dr. Coleman based on his sex.

---

[80] The Formal Grievance Process was abrogated by Defendant Gilliam after only eight days, as described herein.

Case 1:21-cv-00723-CCE-LPA   Document 1   Filed 09/17/21   Page 74 of 100

272. Among other things, Defendant Gilliam demonstrated anti-male bias by prejudging Dr. Coleman "responsible" based only on the allegations made against Dr. Coleman by a female faculty member. This prejudgment is evidenced by Defendant Gilliam's own statements that he was terminating Dr. Coleman as provost "for cause" because the complaint allegations "*crossed the line*" and that he "*didn't give a shit about [Dr. Coleman]*."

273. Upon information and belief, Defendant Gilliam did not know Doe nor have any significant personal or professional relationship or interaction with Doe prior to Doe's complaint against Dr. Coleman and Defendant Gilliam did not speak with Doe about her allegations prior to terminating Dr. Coleman.

274. In contrast, Defendant Gilliam hand-picked and appointed Dr. Coleman as Provost and the two worked closely since Dr. Coleman started his Provost position at UNCG in August of 2020.

275. By prejudging Dr. Coleman "responsible" for sexual harassment based only on Doe's allegations, Defendant Gilliam made a credibility determination in favor of a female faculty member whom he had no prior relationship with (Doe) based solely on her female sex, and such gender-biased credibility determination evidences Defendant Gilliam's anti-male bias.

276. Because of his anti-male bias, Defendant Gilliam erroneously concluded Dr. Coleman was responsible for the alleged sexual harassment; and, through his actions described herein, effectuated a *de facto* conclusion of Dr. Coleman's Title IX

adjudication process to establish his erroneous judgment as the final determination of Dr. Coleman's responsibility.

277.     UNCG's anti-male motivation in initiating the formal Title IX process against Dr. Coleman and its anti-male motivation in severely, excessively, and unlawfully sanctioning Dr. Coleman is evidenced by the University's: decision to initiate the formal grievance process despite Doe's insufficient allegations; refusal to dismiss the Complaint for failing to allege sexually harassing conduct; and by its termination of Dr. Coleman as provost based on the deficient Complaint and without adjudication through the Title IX process.

278.     Title IX requires schools to dismiss a complaint if the allegations—even if proven true—do not constitute sexual harassment:

> If the conduct alleged in the formal complaint would not constitute sexual harassment as defined in § 106.30 even if proved, [or] did not occur in the recipient's education program or activity  [ . . ] then the recipient **must dismiss the formal complaint** with regard to that conduct for the purposes of sexual harassment under title IX or this part[.]

34 C.F.R. § 106.45(b)(3)(i) (emphasis added).[81]

279.     UNCG's anti-male bias is evidenced by its decision to undertake an investigation into Doe's allegations despite that the allegations—even if proven true—did

---

[81] UNCG's corollary Title IX policy 6.3.2, attached as Exhibit S, states, "6.3.2 *Must Dismiss*: If the conduct alleged in the Formal Complaint (1) would not constitute Sexual Harassment, even if proved, (2) did not occur in the UNC Greensboro's education program or activity, or (3) did not occur against a person in the U.S., the Title IX Coordinator will dismiss the formal complaint with regard to that conduct for the purposes of sexual harassment." And UNCG's Formal Grievance Process, attached as Exhibit T, similarly provides on page one: "PRE-INVESTIGATION: If the University determines that the alleged conduct: 1. does not constitute sexual harassment even if proved [ . . . ] The University will dismiss the formal complaint[.]"

76

not meet the definition of sexually harassing conduct under Title IX. *See* Formal Title IX Complaint against Dr. Coleman, attached as Exhibit C and reproduced above, ¶ 59.

280. The entire complaint against Dr. Coleman was based on cherry-picked messages from a two-week platonic text-message exchange between Doe and Dr. Coleman—in which Doe was an active, non-complaining participant—that did not include any sexual content, and the Complaint failed to allege that Doe was in any way denied access to UNCG's education program or activity as a result of the text message exchange.

281. UNCG discriminated against Dr. Coleman by imposing excessively severe sanctions in violation of Title IX—to wit, Defendant Gilliam's retaliatory termination of Dr. Coleman as Provost based on the allegations and prior to a determination of responsibility through the Formal Grievance Process. Defendant Gilliam's retaliatory termination is detailed further in Dr. Coleman's Second Claim for Relief, below.

282. UNCG's actions were motivated by anti-male bias as demonstrated by its disparately favorable treatment of Denise Gabriel—a female UNCG professor accused of sexual misconduct whose entire investigation lasted only four months. See ¶¶ 226—247 above.

283. UNCG's discrimination against Dr. Coleman on the basis of his sex is further evidenced by the clear procedural irregularities and Title IX violations in Dr. Coleman's Formal Grievance Process, as identified in the following paragraph and detailed further in § IV, above ¶¶ 120-225.

284.     UNCG's procedural deficiencies and irregularities include: failure to notify Dr. Coleman of all allegations against him (¶¶ 125-27; 143-47); failure to provide Dr. Coleman a copy of the Formal Complaint (¶ 59 n.18; 125-26); failure to indicate whether the alleged conduct occurred "on campus" or "off campus" (¶¶ 127; 139-140); failure to obtain the full context of the text message exchange between Doe and Dr. Coleman prior to initiating the formal complaint (¶¶ 128-31; 194-95); failure to promptly dismiss the complaint for not alleging conduct constituting sexual harassment, even if proven (¶¶ 132-42); failure to allege if or how Doe was "effectively denie[d] equal access to [UNCG's] education program or activity" so as to constitute sexual harassment as defined in Title IX and UNCG's corollary policy (¶ 142); failure to dismiss the Formal Complaint upon learning from Doe that the alleged text exchange did not cause her to be denied access to UNCG's education program or activity (¶¶ 142; 213-214); failure to provide Dr. Coleman advanced notice of investigative interviews with sufficient time for him to prepare (¶¶ 148-55); failure to provide notice of the location, participants, and purpose of the investigative interviews (¶¶ 148-155); failure to conduct a prompt investigation, or else notify Dr. Coleman of the reasons for delay (¶¶ 135-36); failure to afford Dr. Coleman a presumption of nonresponsibility and to conduct his investigation in a neutral and unbiased manner (¶¶ 156-69); and taking retaliatory adverse employment action against Dr. Coleman because of Doe's allegations against him (¶¶ 155-72).

285.     Investigator/Coordinator Chappell and Deputy Potter's response to Dr. Coleman's concerns about bias and conflict in the Title IX investigation evidences their

anti-male bias against Dr. Coleman. Chappell and Deputy Potter told Dr. Coleman and his attorney that Dr. Coleman waived his right to object to bias and conflict of interest by not raising his concerns on the day Dr. Coleman received the Formal Complaint.

286. Such assertions by Chappell and Potter that Dr. Coleman waived his right to a neutral, impartial process—which he did not—implies Chappell and Potter are unconcerned with Dr. Coleman's right to receive fair treatment and are willing to conduct a biased investigation of the allegations against him, and evidence system-wide anti-male bias against Dr. Coleman.

287. In addition to Investigator/Coordinator Chappell's conflict of interest arising from her consultation with the Chancellor regarding Dr. Coleman's termination, Chappell's bias in favor of females is evidenced by her concurrent position as Director of UNCG's Campus Violence Response Center, her prior employment representing alleged victims of sexual assault at the N.C. Coalition against Sexual Assault, and her handling of the sexual misconduct complaints against Denise Gabriel, detailed in ¶¶ 226-247 above.

288. Because the Complaint allegations do not constitute sexual harassment, Chappell—as Title IX Coordinator—was obligated to promptly dismiss the Complaint under Title IX's mandatory dismissal provision; but Chappell chose to initiate the Title IX grievance process and appoint herself as the investigator pursuant to her authority under UNCG's Title IX Policy.[82]

---

[82] UNCG Title IX Policy 5.6 states: "INVESTIGATOR(S) Official(s) appointed by the Title IX Coordinator to conduct the investigation of an alleged violation of this Policy." UNCG's Title IX Policy is attached as Exhibit S.

289. Defendant Jackson-Newsom oversees UNCG's entire Title IX process and upon information and belief Defendant Jackson-Newsom encouraged and/or allowed Investigator/Coordinator Chappell to disregard Title IX's mandatory dismissal provisions and conduct a baseless, sexually discriminatory investigation of Dr. Coleman in violation of Title IX.

290. Chappell's anti-male bias is evidenced by her actions in: initiating the formal grievance process against Dr. Coleman based on conduct that she knew was not sexual harassment; not dismissing the complaint as required (even when confronted with allegations of bias by Dr. Coleman's counsel); conducting an investigation of Dr. Coleman that violated numerous Title IX policies; and by her preferential treatment of a similarly situated female professor accused of sexual misconduct, Denise Gabriel.

291. Defendant Gilliam's gender-biased prejudgment, bullying, coercion, and retaliatory termination, coupled with his statements to Dr. Coleman, and his consultation with Senior Title IX Administrator Defendant Jackson-Newsom, Title IX Investigator/Coordinator Chappell, the System President, and the Chief Academic Officer in terminating Dr. Coleman show institutional bias against Dr. Coleman not limited to Defendant Gilliam's bias.

292. The procedural irregularities and deficiencies in Dr. Coleman's Title IX process—including its refusal to dismiss the Complaint—in conjunction with: Defendant Gilliam's credibility determination in favor of the female complainant; Investigator/Coordinator Chappell and Kimberley Potter's indifferent responses to Dr.

80

Coleman's concerns of anti-male bias; Investigator/Coordinator Chappell's current and prior work on behalf of female Title IX complainants; and UNCG's disparately favorable treatment of a similarly situated female professor accused of misconduct—Denise Gabriel—raises a plausible inference that UNCG, Defendant Gilliam, and Defendant Jackson-Newsom discriminated against Dr. Coleman on the basis of his male sex.

293.    As a direct and proximate consequence of UNCG's intentional sex discrimination and Title IX violations, Dr. Coleman has sustained ongoing damages including but not limited to: termination of his employment as Provost; reputational harm; and damage to his future employment prospects.

## SECOND CLAIM FOR RELIEF
## TITLE IX RETALIATION
**Against UNCG, Defendant Gilliam and Defendant Jackson-Newsom in their official capacities**

294.    Dr. Coleman realleges and incorporates the allegations of paragraphs 1 through 254 as if fully set forth herein.

295.    Plaintiff invokes this Court's original jurisdiction under Title IX of the Education Act Amendments of 1972, 20 U.S.C. §1681, *et seq*. ("Title IX").

296.    Title IX expressly prohibits recipient-institutions from retaliating against individuals who are the subject of a Title IX investigation:

> *Retaliation prohibited.* No recipient or other person may **intimidate**, **threaten**, **coerce**, **or discriminate against any individual** for the purpose of interfering with any right or privilege secured by title IX or this part [ . . . ] **Intimidation**, **threats**, **coercion**, or **discrimination**, **including charges against an**

81

**individual for code of conduct violations that do not involve sex discrimination or sexual harassment, but arise out of the same facts or circumstances as a** report or complaint of sex discrimination, or a **report or formal complaint of sexual harassment**, for the purpose of interfering with any right or privileged secured by title IX or this part, **constitutes retaliation**.

34 C.F.R. § 106.71 (emphasis added).[83]

297.     As the subject of a Title IX investigation, Dr. Coleman engaged in a protected activity encompassed by Title IX's private cause of action.[84]

298.     Dr. Coleman participated in the Title IX investigation by refusing to resign and effectively end the investigation and by defending against the false Title IX allegations.

299.     Dr. Coleman's participation is protected activity encompassed by Title IX's private cause of action.[85]

300.     UNCG retaliated against Dr. Coleman because he was the subject of, and participated in, a sexual harassment investigation, as averred herein.

301.     Defendant Gilliam was Dr. Coleman's direct supervisor and was personally involved in retaliating against Dr. Coleman as described herein.

---

[83] *See also Fox v. Town of Framingham*, 2016 WL 4771057 (D. Mass. 2016) (unpublished) (holding termination constitutes adverse employment action in the retaliation context).

[84] *See Wilkerson v. University of North Texas*, 223 F. Supp. 3d 592, (E.D. Tex. 2016) (holding the language of Title IX 's prohibition on retaliation applies to "protect the subject of a sexual harassment claim."); *see also*: *Kadel v. Folwell*, 446 F.Supp.3d 1, 11 (M.D.N.C. 2020) (finding the "sweeping language [of Title IX] has long been understood as creating a private cause of action for victims of discrimination by institutes of higher learning, including university employees.").

[85] *See id.*

Case 1:21-cv-00723-CCE-LPA   Document 1   Filed 09/17/21   Page 82 of 100

302.     Defendant Julia Jackson-Newsom was UNCG's Senior Title IX

Administrator in charge of overseeing the University's compliance with federal Title IX

mandates; Defendant Jackson-Newsom was a member of the Chancellor's Council and

was Defendant Gilliam's subordinate and direct report.

303.     UNCG retaliated against Dr. Coleman for participating in the Title IX

investigation by taking the following adverse employment action against him:

    a.  terminating Dr. Coleman as Provost;
    b.  threatening to issue a false and stigmatizing Termination Announcement about Dr. Coleman unless he ended the investigation by resigning from the University;[86] and
    c.  publishing the false and stigmatizing Termination Announcement because he refused to resign from his professorship.[87]

304.     The causal connection between UNCG's retaliatory adverse employment

actions and Dr. Coleman's protected activity as the subject of a sexual harassment

investigation is evidenced by the following:

**Timing:**
    a.  The Title IX Investigation began 14 December 2020; Defendant Gilliam terminated Dr. Coleman as provost eight days later on 22 December 2020.
    b.  UNCG's nearly 9-month-long "investigation" of the Formal Complaint allegations that were ultimately dismissed as insufficient on 1 September 2021.

**Defendant Gilliam's statements and conduct:**
    c.  When Defendant Gilliam notified Dr. Coleman of the Title IX Investigation in their 14 December 2020 meeting, he expressed anger about Dr. Coleman

---

[86] *See* Exhibits D; E; F; G; and H; *see also* § III, ¶¶ 55—114, above.
[87] *See id.*

and Doe's correspondence (the conduct allegedly constituting sexual harassment).

d. Defendant Gilliam told Dr. Coleman that he had "fired a soccer coach" so he would have "no problem" terminating Dr. Coleman.

e. Defendant Gilliam stated that the Title IX Complaint against Dr. Coleman put UNCG "at great risk".

f. Defendant Gilliam stated that the Title IX Complaint personally embarrassed Defendant Gilliam and put the Chancellor's reputation "at risk" because he had pulled Dr. Coleman from the "non-interview" pool to appoint Dr. Coleman as Provost.

g. When Dr. Coleman tried to defend against the Title IX Complaint allegations, Defendant Gilliam dismissed Dr. Coleman's explanations by implying they were "bull shit".

h. Defendant Gilliam periodically glanced at a thin document throughout the meeting that, upon information and belief, was either the Title IX Complaint or a summary prepared by staff.

i. Eight days after the Complaint was initiated, Defendant Gilliam told Dr. Coleman he would publish a statement that Dr. Coleman was terminated "*for cause*" unless Dr. Coleman resigned from his contractual professor position with the University.

j. When Dr. Coleman refused to resign (and thereby end his participation in the Title IX process) Defendant Gilliam terminated him and published the stigmatizing Termination Announcement.

k. In a second meeting on 22 December 2020 (eight days after the Title IX investigation initiated), Defendant Gilliam terminated Dr. Coleman as provost, repeatedly stated more than fifteen times that he was terminating Dr. Coleman "*for-cause*" and repeatedly stated that Dr. Coleman's correspondence with Doe "*crossed the line*". (Dr. Coleman's correspondence with Doe was the conduct allegedly constituting sexual harassment, per the Formal Complaint attached as Exhibit C).

l. Defendant Gilliam did not state or otherwise indicate that anything other than the Complaint allegations was the "cause" for Dr. Coleman's termination as Provost.

m. Defendant Gilliam told Dr. Coleman he felt pressured to take aggressive action against Dr. Coleman because several female leaders at UNCG were aware of the allegations against Dr. Coleman.

84

n. Defendant Gilliam told Dr. Coleman, "*I only care about the University, I don't give a shit about you*."

o. Defendant Gilliam told Dr. Coleman he consulted with the Title IX Investigators, the System President, and the System Chief Academic Officer in making his decision to terminate Dr. Coleman as provost because of the complaint allegations.

p. Defendant Gilliam told Dr. Coleman the Title IX investigation would cease if Dr. Coleman resigned from his contractual position as biology professor at UNCG.

q. Defendant Gilliam indicated if Dr. Coleman refused to resign, the Title IX investigation would continue.

r. Defendant Gilliam gave Dr. Coleman a termination letter on 22 December 2020 that memorialized Defendant Gilliam's threat to issue a negative statement about Dr. Coleman unless he resigned. (Exhibit D).

s. The same day Dr. Coleman received Defendant Gilliam's termination letter (22 December 2020) UNCG's General Counsel, Jerry Blakemore, sent Dr. Coleman's attorney a termination letter stating the Title IX investigation was ongoing and providing Dr. Coleman "the alternative" option of resigning from his professor position that would end the Title IX investigation. (Exhibit E).

t. The body of the email attaching the Blakemore Letter and Statement Draft stated:

> **The second option [resignation] would allow your client to pursue other administrative or faculty options outside of UNC Greensboro, avoid the possibility of further action taken on the part of UNC Greensboro [through the Title IX process][.]**

Exhibit F, (emphasis added).

305.    As a direct and proximate result of UNCG'S retaliation, Dr. Coleman has suffered—and continues to suffer—damages including but not limited to: damage to his professional reputation and good standing in the UNCG community, the Greensboro

community, and the higher education community nationwide; and loss of professional opportunity.

## THIRD CLAIM FOR RELIEF
## DEPRIVATION OF DUE PROCESS
**Against Defendant Gilliam and Defendant Jackson-Newsom in their official capacities for prospective and injunctive relief and against Defendant Gilliam and Defendant Jackson-Newsom in their individual capacities for damages**

306.    Dr. Coleman realleges and incorporates the allegations of paragraphs 1 through 254 as if fully set forth herein.

307.    Under Article III of the Constitution, federal courts can hear "all cases, in law and equity, arising under this Constitution, [and] the laws of the United States..." (U.S. Const., Art. III, §2).

308.    The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

309.    42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. [ . . . ][.]

86

310.     The *Ex Parte Young* Doctrine[88] strips immunity in a §1983 suit seeking prospective relief against state officials in their official capacities.[89]

311.     A state official sued for damages in her individual capacity is a suable "person" under §1983, even if the claim for relief arose out of the official's official responsibilities,[90] and to establish personal liability in a §1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right.[91]

312.     Dr. Coleman states this cause of action for prospective and/or injunctive relief against Defendant Gilliam in his official capacity as Chancellor of UNCG who is "The administrative and executive head of" UNCG and who exercises "complete executive authority therein" and is responsible for carrying out policies promulgated by the Board of Governors and the board of trustees. *See* The UNC Policy Manual, *The Code,* Chapter V § 502.D.

313.     Dr. Coleman states this cause of action for damages against Defendant Gilliam in his individual capacity.

314.     Dr. Coleman also states this cause of action for prospective and/or injunctive relief against Defendant Julia Jackson-Newsom in her official capacity as Senior Title IX Administrator.

---

[88] *Ex Parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908).
[89] *See Davis v. University of North Carolina At Greensboro*, 1:19CV661 (M.D.N.C. Sep. 29, 2020). *See also Hutto v. Finney,* 437 U.S. 678 (1978) (when a federal court grant *Young* prospective relief, it has power to enforce that relief, including by ordering monetary sanctions payable out of the state treasury.).
[90] *Hafer v. Melo*, 502 U.S. 781, 786 (1997).
[91] Id. (citing *Kentucky v. Graham*, 473 U.S. 159 (1985)).

Case 1:21-cv-00723-CCE-LPA   Document 1   Filed 09/17/21   Page 87 of 100

315.     Dr. Coleman states this action for damages against Defendant Julia Jackson-Newsom in her individual capacity.

316.     A Fourteenth Amendment liberty interest is implicated by the government's public announcement of reasons for an employee's discharge[92], and if the government discharges an employee amidst allegations of misconduct, the employee may have a procedural due process right to notice and an opportunity to clear his name.[93]

317.     Dr. Coleman has a constitutionally protected liberty interest in his good name, reputation, honor and integrity, and this constitutional right is clearly established and has been clearly established at all relevant times.

318.     Defendant Gilliam and Defendant Jackson-Newsom—acting under color of state law—pre-determined Dr. Coleman responsible for the conduct alleged in the Complaint and terminated Dr. Coleman based on the false Title IX allegations against him without affording Dr. Coleman a meaningful hearing or opportunity to be heard, and in a manner that imposed a stigma on Dr. Coleman and that seriously damaged his standing and associations in his community through the Termination Announcement, as averred herein above.

319.     Such intentional conduct by defendants deprived Dr. Coleman of his clearly established constitutional right to due process.

---

[92] *See Sciolino v. City of Newport News*, 480 F.3d 642, 645-46 (4th Cir. 2007).
[93] *See Bledsoe v. City of Horn Lake, Miss.*, 449 F. 3d 650, 653 (5th Cir. 2006).

320.     Dr. Coleman had two meetings with Defendant Gilliam after the Title IX Complaint was initiated. In the first meeting on 14 December 2020, attended by Senior Title IX Administrator Defendant Jackson-Newsom, Defendant Gilliam confronted Dr. Coleman with the Title IX allegations and dismissed Dr. Coleman's attempts to explain or offer context in defense of how his conduct had been misconstrued. Defendant Gilliam started the second meeting 22 December 2020 by terminating Dr. Coleman as Provost.

321.     Dr. Coleman was not given notice or an opportunity to be heard prior to his discharge or in either meeting with Defendant Gilliam, including the first meeting attended by Senior Title IX Administrator Defendant Jackson-Newsom.

322.     Within 24 hours of Dr. Coleman's termination meeting with Defendant Gilliam, the Chancellor personally published—or authorized the publication of—a false and stigmatizing statement that Dr. Coleman was terminated for misconduct.[94]

323.     Defendant Gilliam's predetermination of responsibility neglected to provide Dr. Coleman any meaningful opportunity to be heard prior to his termination and foreclosed the possibility of Dr. Coleman receiving a fair and impartial determination of responsibility under the formal grievance process mandated by Title IX by creating conflicts of interest and depriving Dr. Coleman the opportunity to clear his name by instituting a *de facto* resolution to the Title IX process, thereby depriving Dr. Coleman of his due process rights.

---

[94] *See* Termination Announcement attached as Exhibit H.

89

324.     Defendant Gilliam consulted with Title IX Coordinator/Investigator Murphie Chappell and Defendant Julia Jackson-Newsom in deciding to terminate Dr. Coleman and, as Senior Title IX Administrator, Jackson-Newsom is responsible for oversight of UNCG's entire Title IX process, including the actions of Coordinator/Investigator Chappell.

325.     As Title IX Coordinator, Murphie Chappell was responsible for ensuring the University's compliance with Title IX, including ensuring anyone involved in the Title IX process complied with their responsibility to act without conflict of interest or bias and Murphie Chappell acts under the authority and direction of defendants Gilliam and Jackson-Newsom.[95]

326.     Defendant Gilliam—acting under color of state law pursuant to his role as Chancellor—facilitated the University's disregard for Dr. Coleman's due process rights in its unlawful and biased Title IX investigation and imposition of adverse employment actions against Dr. Coleman, as averred herein above.

327.     Defendant Jackson-Newsom—acting under color of state law pursuant to her role as UNCG Senior Title IX Administrator—either directly facilitated or impermissibly allowed the University to disregard Dr. Coleman's due process rights in its unlawful and biased Title IX investigation and imposition of adverse employment actions against Dr. Coleman, as detailed herein above.

---

[95] See UNCG Title IX Policy 5.9 and 6.1, attached as Exhibit S.

328.     Defendant Gilliam and Defendant Jackson-Newsom's intentional conduct, as averred herein, deprived Dr. Coleman of his clearly established right to due process.

329.     UNCG dismissed the Complaint against Dr. Coleman only after faced with the possibility of being held accountable for their unlawful and biased Title IX investigation via the instant suit.

330.     Defendants' violation of Dr. Coleman's constitutional due process rights caused—and continues to cause—Dr. Coleman damages, including but not limited to damage to his reputation, employment, and future employment prospects, as evidenced by the multitude of job opportunities Dr. Coleman has been qualified for, has applied for, but has been denied on the basis of the negative press generated by Defendant Gilliam's Termination Announcement.

331.     The harm Dr. Coleman suffered is a natural and probable consequence of defendants' actions as averred herein.

**FOURTH CLAIM FOR RELIEF**
**DEPRIVATION OF EQUAL PROTECTION**
**U.S. CONST. amend XIV**
**Against Defendant Gilliam and Defendant Jackson-Newsom in their official capacities for prospective and injunctive relief and against Defendant Gilliam and Defendant Jackson-Newsom individually for damages.**

332.     Dr. Coleman realleges and incorporates the allegations of paragraphs 1 through 254 as if fully set forth herein.

333.     Under Article III of the Constitution, federal courts can hear "all cases, in law and equity, arising under this Constitution, [and] the laws of the United States..." (U.S. Const., Art. III, §2).

334.     The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

335.     42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. [ . . . ][.]

336.     The *Ex Parte Young* Doctrine[96] strips immunity in a §1983 suit seeking prospective relief against state officials in their official capacities.[97]

337.     A state official sued for damages in her individual capacity is a suable "person" under §1983, even if the claim for relief arose out of the official's official responsibilities,[98] and to establish personal liability in a §1983 action, it is enough to

---

[96] *Ex Parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908).
[97] *See Davis v. University of North Carolina At Greensboro*, 1:19CV661 (M.D.N.C. Sep. 29, 2020). *See also Hutto v. Finney*, 437 U.S. 678 (1978) (when a federal court grant *Young* prospective relief, it has power to enforce that relief, including by ordering monetary sanctions payable out of the state treasury.).
[98] *Hafer v. Melo*, 502 U.S. 781, 786 (1997).

show that the official, acting under color of state law, caused the deprivation of a federal right.[99]

338.     Dr. Coleman states this cause of action for prospective and/or injunctive relief against Defendant Gilliam in his official capacity as Chancellor of UNCG who is "The administrative and executive head of" UNCG and who exercises "complete executive authority therein" and is responsible for carrying out policies promulgated by the Board of Governors and the board of trustees. *See* The UNC Policy Manual, T*he Code* Chapter V § 502.D.

339.     Dr. Coleman states this cause of action for damages against Defendant Gilliam in his individual capacity.

340.     Dr. Coleman also states this cause of action for prospective and/or injunctive relief against Defendant Julia Jackson-Newsom in her official capacity as Senior Title IX Administrator.

341.     Dr. Coleman states this cause of action for damages against Defendant Julia Jackson-Newsom in her individual capacity.

342.     Dr. Coleman has a clearly established constitutional right to equal protection under the law and this right was clearly established at all relevant times.

343.     Defendant Gilliam and Defendant Jackson-Newsom, acting under color of state law, regulation, customs and usages, intentionally authorized and perpetrated a sexually biased and discriminatory Title IX investigation, as evidenced by the Title IX

---

[99] *Id*. (citing *Kentucky v. Graham*, 473 U.S. 159 (1985)).

policy violations and disparately favorable treatment of a similarly situated female professor, Denise Gabriel.

344.     Defendant Gilliam and Defendant Jackson-Newsom's conduct as averred herein deprived Dr. Coleman equal protection under the law.

345.     Defendant Gilliam and Defendant Jackson-Newsom's violation of Dr. Coleman's right to equal protection caused—and continues to cause—Dr. Coleman damages including but not limited to injury and damage to his reputation, employment, and future employment prospects.

346.     UNCG dismissed the Complaint against Dr. Coleman only after faced with the possibility of being held accountable for their unlawful and biased Title IX investigation via the instant suit, and the dismissal does not rectify the harm incurred.

347.     The harm Dr. Coleman suffered is a natural and probable consequence of defendants' actions as averred herein.


### FIFTH CLAIM FOR RELIEF
### OBSTRUCTION OF JUSTICE
**Against Defendant Gilliam in his individual capacity**

348.     Dr. Coleman realleges and incorporates the allegations of paragraphs 1 through 254 as if fully set forth herein.

349.     This court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because Dr. Coleman's state law and common law claims are so closely related to the

94

federal law claims as to form the same case or controversy under Article III of the United

States Constitution.

350.    On 23 December 2020 UNCG published an announcement (the

"Termination Announcement") stating:

> *UNCG Removes Provost; Interim Named as Search Begins*
> December 23, 2020
> UNC Greensboro today announced that it has removed Jim
> Coleman from the office of Provost due to behavior that did
> not meet expectations for senior leaders at UNCG. Coleman
> joined UNCG in July 2020 from the same role at the University
> of Arkansas. Per contractual obligation, he will retain his
> faculty position in the Department of Biology. Given this is a
> confidential and ongoing personnel matter, the University will
> provide no further details to respect the privacy of all involved.

(the "Termination Announcement") attached as Exhibit H.

351.    The Termination Announcement was published on UNCG's official

website and UNCG emailed[100] the Termination Announcement to all full, part-time, and

temporary university faculty and staff the same day.

352.    Dr. Coleman did not violate—nor was Dr. Coleman informed he had

violated or been accused of violating—any UNCG policy (other than the false Title IX

allegations)[101]; and Dr. Coleman was not informed of any such "expectations for senior

leaders" embodied in UNCG policy or otherwise, and upon information and belief,

UNCG does not have any policy defining its "expectations for senior leaders".

---

[100] *See* Exhibit H. The bottom of the email states: "This email is an official communication from The University of North Carolina at Greensboro."
[101] The Dismissal Letter is the first and only time Dr. Coleman has been informed that UNCG intends to attempt to find a separate university policy that Dr. Coleman's text message communication may have violated. See Exhibit Z, p. 2.

Case 1:21-cv-00723-CCE-LPA   Document 1   Filed 09/17/21   Page 95 of 100

353.     Upon information and belief, Defendant Gilliam either personally authored the Termination Announcement or directed the author of the Termination Announcement regarding what language to use in the Termination Announcement and Defendant Gilliam ordered and authorized publication of the Termination Announcement as "the leader of and the official spokesperson for [UNCG]".[102]

354.     Defendant Gilliam interfered with the pending official Title IX investigation by: threatening, intimidating, and coercing Dr. Coleman to resign from the University to extinguish the formal Title IX Grievance Process; by contravening the Formal Grievance Process to sanction Dr. Coleman with termination; by creating conflicts of interest for his subordinate administrators who were directly involved in Dr. Coleman's Formal Grievance Process (and who were required to maintain neutrality) by consulting his subordinate administrators involved in Dr. Coleman's Title IX process about terminating Dr. Coleman and publicly announcing his decision through the published Termination Announcement.

355.     Defendant Gilliam's conduct effectuated a *de facto* conclusion of Dr. Coleman's case and directly impeded Dr. Coleman's formal Title IX process by preventing Dr. Coleman from receiving a fair, unbiased adjudication through the formal Title IX Grievance Process for over 8 months.

---

[102] *See* UNC Policy Manual, *The Code*, Chapter V, § 502D(1).

356.     Defendant Gilliam's *de facto* resolution was only thwarted when Dr. Coleman communicated his intent to seek judicial intervention to stop UNCG from further violating his statutory and constitutional rights.

357.     Defendant Gilliam knew or reasonably should have known his conduct would interfere with Dr. Coleman's clearly established due process rights under Title IX to be presumed "not responsible" and to receive a fair, unbiased investigation and adjudication via the formal Title IX grievance process.

358.     Defendant Gilliam knew or should have known a public Termination Announcement would damage Dr. Coleman's future job prospects and Defendant Gilliam knew or should have known his Termination Announcement would obstruct a fair resolution of the Title IX allegations by putting his subordinate Title IX administrators in the position of either supporting Defendant Gilliam's decision by finding Dr. Coleman "responsible", or directly opposing the Defendant Gilliam by finding Dr. Coleman "not responsible" and potentially facing negative employment repercussions.

359.     Defendant Gilliam knowingly, willfully, or with a reckless indifference acted to obstruct Dr. Coleman's formal Title IX Grievance Process and Defendant Gilliam's conduct did in fact obstruct justice by unlawfully interfering with and impeding the Title IX investigation to effectuate a *de facto* conclusion to the Formal Grievance Process, which *de facto* conclusion extended the "investigation" over 8-months and was only overturned via dismissal upon threat of judicial action by Dr. Coleman.

360.     Defendant Gilliam's obstructive conduct deprived Dr. Coleman a fair and unbiased investigation and adjudication through the Formal Grievance Process; subjected Dr. Coleman to over 8 months of investigative scrutiny; caused Dr. Coleman to be denied over 20 potential job opportunities; and such conduct has not been rectified through any public announcement of the Complaint dismissal that would clear Dr. Coleman's name of wrongdoing.

361.     As a result of Defendant Gilliam's obstructive conduct, Dr. Coleman has suffered damages including but not limited to: harm to his reputation and future job prospects as detailed in ¶¶ 108-119, supra; and deprivation of his right and opportunity to have his named cleared by UNCG.

362.     The relief demanded is for damages incurred or to be incurred in excess of $25,000.00.

363.     Defendant Gilliam is not shielded from liability by the Public Duty Doctrine because obstruction of justice is an intentional tort; Defendant Gilliam is not entitled to public official immunity for his willful, deliberate, recklessly indifferent, and/or bad faith actions; and Defendant Gilliam is liable for the natural and probable consequences of his actions in harming Dr. Coleman as averred herein.

# PRAYER FOR RELIEF

WHEREFORE, Dr. Coleman respectfully requests the following relief:

1. Declaratory relief, including a declaration that the investigative process and sanctioning by Defendants in Dr. Coleman's Title IX case were and are unconstitutional, improper, and violative of Dr. Coleman's rights;

2. For an award of damages in an amount to be determined at trial, but in excess of $300,000.00, resulting from UNCG, Defendant Gilliam, and Defendant Jackson-Newsom's violation of Dr. Coleman's rights under Title IX; Defendant Gilliam and Defendant Jackson-Newsom's violation of Dr. Coleman's constitutional due process and equal protection rights; and Defendant Gilliam's obstruction of justice in UNCG's Title IX investigation of Dr. Coleman;

3. For an award of punitive damages related to Defendant Gilliam's obstruction of justice pursuant to N.C. Gen. Stat. §1D;

4. An award of Dr. Coleman's attorney's fees and costs authorized in § 1983 actions according to 42 U.S.C. § 1988(b); and

5. For such further relief as the Court deems necessary in the interests of justice.

This the 17th day of September, 2021

By: /s/ Randolph M. James
    Randolph M. James
    N.C. State Bar # 10000
    *Attorney for Plaintiff*
    RANDOLPH M. JAMES, P.C.
    P.O. Box 20069
    Winston-Salem, N.C. 27120
    Telephone:  (336) 724-7707
    Facsimile:  (336) 724-9722
    E-mail:  rmjames@rmjameslaw.com