**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**CIVIL ACTION NO: 1:21-CV-723-CCE-LPA**

JAMES COLEMAN,

Plaintiff,

v.

THE UNIVERSITY OF NORTH CAROLINA AT GREENSBORO, Dr. FRANKLIN D. GILLIAM, JR., individually and in his official capacity, JULIA JACKSON-NEWSOM, individually and in her official capacity,

Defendants.

**BRIEF IN SUPPORT OF DEFENDANTS THE UNIVERSITY OF NORTH CAROLINA AT GREENSBORO AND DR. FRANKLIN D. GILLIAM, JR.'S MOTION TO DISMISS**

## Introduction

In the seven months that James Coleman served as Provost at the University of North Carolina at Greensboro, he demonstrated poor judgment. One example of his poor judgment was his texting relationship with Jane Doe, an untenured junior faculty member.

In his texts with Doe, Coleman reminded her of his position and power by letting her know when he met with the Dean supervising her and updating her on tenure procedures. In addition, he flirted with her by writing her a song and letting her know he was jealous of the people who were hanging out with her.

Because of Coleman's poor judgment with respect to Doe and other matters, UNC Greensboro Chancellor Franklin D. Gilliam, Jr., decided to relieve Coleman of his duties as Provost, and Coleman returned to his tenured position teaching in the biology department.

A Title IX investigation was also conducted based on the Formal Complaint Doe filed with the UNC Greensboro Title IX office that Coleman was sexually harassing her. This complaint was eventually dismissed.

As a result of these events, Coleman has sued UNC Greensboro, Gilliam, and Julia Jackson-Newsom, who he alleges served as the "Senior Title IX Administrator."

Coleman's claims against UNC Greensboro and Gilliam should be dismissed.

## Statement of the Case

On September 17, 2021, Coleman filed a complaint against UNC Greensboro, Gilliam in his official and individual capacity, and Jackson-Newsom in her official and individual capacity. Compl., ECF 1. The complaint asserts five causes of action:

1. A Title IX sex discrimination claim against UNC Greensboro; Gilliam, in his official capacity; and Jackson-Newsom, in her official capacity;

2. A Title IX retaliation claim against UNC Greensboro; Gilliam, in his official capacity; and Jackson-Newsom, in her official capacity;

3. A section 1983 due process claim against Gilliam and Jackson-Newsom in their official and individual capacities;

4. A section 1983 equal protection claim against Gilliam and Jackson-Newsom in their official and individual capacities; and

5. An obstruction of justice claim against Gilliam in his individual capacity.

Compl. pp 71, 81, 86, 91, 94.

On September 30, 2021, UNC Greensboro and Gilliam agreed to waive service. On October 1, 2021, Jackson-Newsom agreed to waive service. Defendants' responses to the complaint are due November 19, 2021.

## Summary of the Facts

### A. Coleman joins UNC Greensboro

Coleman is in his sixties and has nearly 30 years of experience in higher education. Compl. ¶ 12. In July 2020, Coleman joined UNC Greensboro as the new Provost and Executive Vice Chancellor. Compl. ¶ 13, Ex. A, ECF No. 1-1. In the Provost position, Coleman was responsible for "working closely with faculty and staff in institutional efforts related to recruitment and retention of qualified faculty," among other things. Compl. ¶

15. Chancellor Gilliam was Coleman's direct supervisor. Compl. ¶ 265. In addition to assuming the duties of Provost, Coleman also became a tenured professor in the biology department. Compl. ¶ 13 n.4.

At this same time, COVID-19 was affecting social interactions and community activities. Compl. ¶ 16. To become part of the UNC Greensboro community, Coleman began attending informal social gatherings organized by Coleman's colleagues. Compl. ¶¶ 14, 17. It was at one of the events that Coleman first met Doe, a UNC Greensboro professor and subordinate of the Provost. Compl. ¶¶ 18, 56 n 12.

**B. Coleman's texting relationship with Doe.**

After their first encounter, Coleman saw Doe again at second event about a week later. Compl. ¶ 20. At this second meeting, Coleman took a photograph of Doe with his dog, which he texted to Doe.[1] Compl. ¶ 21. For the next 13 days, from November 13 to November 25, 2020, Coleman and Doe engaged in daily text message exchanges. Compl. Exs. B(1) & B(2), ECF Nos. 1-2 & 1-3. The exchange included 360 text messages (including 15 Tapbacks[2])—203 sent by Coleman to Doe and 157 sent from Doe to Coleman.

---

[1] Coleman's dog and Doe share the same name. Compl. ¶ 20.

[2] This is when you respond to a text message by selecting one of six predetermined emoji. These include heart, thumbs up, thumbs down, HaHa, exclamation point, and question mark.

The messages ranged from discussions about dogs, music, kayaking, food, and exercise. *See* Compl. Exs. B(1) & B(2). During the text exchange, Coleman complimented Doe. For example, on November 14 Coleman sent an audio recording of a piano song and wrote: "I made this simple piano song up after texting with u this morning…guess u inspired me." Compl. Ex. B(1) at 23. Later that same day, he wrote: "I'm just hanging with the blonde [Doe] watching football... it's relaxing. I will just be jealous of the folks hanging with the dark haired one… haha.." Compl. Ex. B(1) at 27.

He also attempted to informally meet with Doe. As an example, on November 15, Coleman invited Doe to stop by Mossman, which is the building where his UNC Greensboro office is located. Compl. Ex. B(1) at 33. On November 23, Coleman texted that he "went for a walk (awful day). Landed [outside your building]. I am about to head back unless u have a minute to say hi." Compl. Ex. B(2) at 45. Doe responded that she was not at school. *Id.*

Further, he had Doe over to his home. On November 21, Doe went to Coleman's house for breakfast and kayaking with Coleman, his wife and his adult stepson. Compl. ¶ 24.

The messages also discussed Coleman's work as Provost. On November 15, Coleman texted Doe to let her know that he had just met with the Dean who oversaw her work. Compl. Ex. B(1) at 41.

**C. Doe tells Coleman she is uncomfortable.**

On November 25, 2020, Doe told Coleman that she was uncomfortable. Compl. Ex. B(2) at 55-59. She explicitly wrote to Coleman that the texting "made [her] feel rather uncomfortable" explaining that "the amount of flattery, your interest in seeing me, and the goodnight/good morning texts are more attention than I would like from the Provost." Compl. Ex B(2) at 55. She also told Coleman that he had put her "in a confusing and difficult situation as a junior faculty and a young, single woman." Compl. Ex. B(2) at 57, 58.

Despite Doe's unambiguous message telling Coleman that he had made her uncomfortable, he continued texting her. *See* Compl. Ex. B(2) at 59-84. Between November 27 to December 5, Coleman sent Doe nine additional text messages with Doe responding twice. *See* Compl. Ex. B(2) at 68-82. On November 28, Coleman asked Doe if it would be okay if he mentioned her work in a presentation to the Board of Trustees. Compl. Ex. B(2) at 69. Doe said this was fine. Compl. Ex. B(2) at 70. On December 5, Doe responded to Coleman's December 4 message by writing:

> I appreciate your message. I'm shocked that you didn't realize that you put me in an stressful, uncomfortable situation. I think I underplayed in my previous text how much your interactions affected me. It made me wanting (sic) to apply for other jobs and quit working at UNCG.
>
> I previously said that I would be okay being friends, but reflecting on it more, I truthfully need some time and space away from this whole situation. If you need to contact me, you can email me at my work email.

Compl. Ex. B(2) at 80-82.

### D. The Title IX Investigation

Following this additional text exchange, a Title IX complaint was filed with UNC Greensboro's Title IX office, and Coleman was provided with notice of the Title IX investigation on December 14, 2020. Compl. Ex. C, ECF No. 1-4. Two days later Coleman met with the Title IX investigators. Compl. ¶ 55 n.11. The investigators attempted to schedule a second meeting with Coleman in early January. Compl. Exs. U & V, ECF Nos. 1-22 & 1-23. However, this meeting did not occur. For reasons not noted in the complaint, Coleman's second interview did not occur until almost three months later on April 1, 2021. Compl. ¶ 194 n.49. Five months later, Coleman was informed the Title IX complaint was being dismissed and he was provided with the Title IX dismissal letter. Compl. ¶ 55 n 1, Ex. Z, ECF No. 1-27.

### E. Coleman is relieved of his duties as Provost.

On December 14, Gilliam, Coleman's direct supervisor, met with Coleman regarding the sexual harassment allegations. Compl. ¶¶ 30, 265. Gilliam also informed Coleman that a formal Title IX Complaint had been initiated and that a Title IX investigation would proceed. Compl. ¶¶ 30, 69.

On December 22, Gilliam met with Coleman a second time. Compl. ¶ 72. According to Coleman, at that meeting, Gilliam terminated Coleman as Provost because Coleman's two-week correspondence with Doe "crossed the line." Compl. ¶¶ 74, 75. Gilliam also gave Coleman a letter relieving Coleman of his duties as Provost under "University of North Carolina 300.1.1 Policy on Senior Academic and Administrative Officers." Compl. ¶ 74, Ex. D, ECF No. 1-5. Gilliam offered Coleman two options – to retreat to a tenured professor in the biology department, or resign from his position as provost and professor. Compl. ¶ 83.

That day, UNC Greensboro also sent Coleman's counsel an email advising that it intended to issue a public statement related to Coleman's decision and provided two draft statements. Compl. ¶¶ 90, 91, Ex. G, ECF No. 1-8. The following day, UNC Greensboro published a statement announcing that "it has removed Jim Coleman from the office of Provost due to behavior that did not meet expectation for senior leaders at UNC." Compl. ¶ 93, Ex. H, ECF No. 1-9.

## Questions Presented

I. Has Coleman alleged that he was retaliated against because he engaged in an activity protected under Title IX when he was the respondent in a Title IX complaint?

II. Has Coleman alleged that his sex was the but-for cause of the Title IX investigation into his actions?

III. Does the Ex Parte Young exception apply to Coleman's official capacity claims under section 1983 against Gilliam because Coleman is seeking prospective or injunctive relief?

IV. Has Coleman alleged that Gilliam, in his individual capacity, deprived Coleman of a liberty interest in his name because the termination announcement accused Coleman of being dishonest or immoral?

V. Has Coleman alleged that Gilliam, in his individual capacity, treated him differently from similarly situated individuals or intentionally discriminated against him?

VI. Has Coleman alleged that Gilliam violated a clearly established legal principal at the time Gilliam allegedly violated Coleman's equal protection and due process rights?

VII. Has Coleman alleged any intentional conduct by Gilliam to obstruct Coleman's ability to seek or obtain a legal remedy?

## Argument

### Legal Standard for Dismissal

Coleman's official capacity section 1983 claims are barred by sovereign immunity. Under federal law, when a defendant raises the issue of sovereign immunity, it may be addressed under either Rule 12(b)(1) or Rule 12(b)(6) of

the Federal Rules of Civil Procedure. *See Fleming v. Va. State Univ.*, No. 3:15cv268, 2016 WL 927186, at *1 n.4 (E.D. Va. Mar. 4, 2016). As a result, Defendants UNC Greensboro and Gilliam (Defendants) move to dismiss Coleman's official capacity section 1983 claims under Rule 12(b)(1) and Rule 12(b)(6).

Under Rules 12(b)(1) and 12(b)(6), the Court should grant Defendants' motion to dismiss because the complaint fails to allege sufficient facts to establish that this Court has subject-matter jurisdiction. *See Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).

Defendants also move to dismiss Coleman's Title IX claims, individual capacity equal protection claim, and individual capacity due process claim under Rule 12(b)(6). This Court should dismiss these claims because even if all factual inferences are drawn in his favor, Coleman has not pleaded sufficient factual content to allow this Court to reasonably infer that Defendants violated Title IX, the equal protection clause, or Coleman's due process rights. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## I. Coleman's claim for retaliation under Title IX fails because he has not alleged that he engaged in an activity protected under Title IX.

The Supreme Court has clarified Title IX supports a retaliation claim because retaliating against a person who has complained about "sex

discrimination is another form of intentional sex discrimination encompassed by Title IX." *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 173 (2005). Thus, Coleman can assert a retaliation claim under Title IX if he alleges that he engaged in an activity protected by Title IX and that Defendants took adverse action against him because of his participation in the protected activity. *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 694 (4th Cir. 2018).

Coleman has not alleged that he engaged in an activity protected by Title IX. Coleman claims that being the subject of and participating in a Title IX investigation is a protected activity. Compl. ¶¶ 297-98. Case law does not support this assertion.

The type of activity that is protected by Title IX is complaining of sex discrimination: not being the subject of or participating in a Title IX investigation. *See Kearney v. W. Carolina Univ.*, No. 1:20-CV-00100-MR-DSC, 2021 WL 1429472, at *3 (W.D.N.C. Feb. 22, 2021), *rep. and recommendation adopted*, No. 1:20-CV-00100-MR-DSC, 2021 WL 3861157 (W.D.N.C. Aug. 27, 2021); *see also DuBois v. Bd. of Regents of Univ. of Minn.*, 439 F. Supp. 3d 1128, 1137-38 (D. Minn. 2020), *aff'd*, 987 F.3d 1199 (8th Cir. 2021).

In fact, a district court recently dismissed a Title IX retaliation claim when the plaintiff "merely responded to complaints made against her." *Kearney*, No. 1:20-CV-00100-MR-DSC, 2021 WL 1429472, at *3. Furthermore, at least one court has concluded that participation in a Title IX investigation by a person other than the accused is not a protected activity. *DuBois*, 439 F. Supp. 3d at 1138.

For these reasons, Coleman has not alleged that he has engaged in an activity protected by Title IX. As a result, Coleman's retaliation claim should be dismissed.

## II. Coleman's failure to allege that his sex was the but-for cause of the Title IX investigation defeats his sex discrimination claim.

To prevail on his claim for sex discrimination, Coleman must plausibly allege "a causal link between [his] sex and the university's challenged disciplinary proceeding." *Sheppard*, 993 F.3d at 236. In other words, Coleman must allege facts to show that his sex was the but-for cause of the investigation. *See id.* at 236-37.

Coleman has not alleged that his sex was the but-for cause of the Title IX investigation for at least three reasons.

First, Coleman's own complaint implies that his sex was not the but-for cause of the investigation. Multiple times throughout his complaint,

Coleman asserts that "cherry-picked text messages" presented a "distorted factual narrative." Compl. ¶ 60. This assertion implicitly acknowledges that the text messages can be read to warrant a Title IX investigation, thereby undermining the idea that Coleman's sex was the but-for cause of the investigation.

Second, Coleman can establish that his sex was the but-for cause of the investigation if he plausibly alleges that he was treated differently from a similarly situated individual. *Sheppard*, 993 F.3d at 237 (analyzing whether the plaintiff was similarly situated with another individual). Coleman has not done this.

Coleman claims that UNC Greensboro and Gilliam treated him less favorably than a tenured, female professor in the theatre department. However, Coleman and the theatre professor are not similarly situated. Coleman was the Provost, which is the second most senior administrator at the University. His direct supervisor was the Chancellor. Compl. Ex. A at 3. The tenured professor cited by Coleman had no administrative responsibilities and reported to her school director, not the Chancellor. As a result, Coleman has not identified a similarly situated individual who was treated differently than him.

In fact, the complaint identifies a soccer coach who possibly received similar treatment to Coleman. Compl. ¶ 64. It is unclear from the complaint why the soccer coach was fired, but the complaint implies that Gilliam saw the situation with Coleman as similar to the situation with the soccer coach and treated the individuals similarly. Compl. ¶ 64.

Third, Coleman could allege facts to show that UNC Greensboro and Gilliam gave more weight to statements made by Doe than to statements made by Coleman during the course of the investigation. *See, e.g.*, *Doe v. Washington & Lee Univ.*, No. 6:19-CV-00023, 2021 WL 1520001, at *13-14 (W.D. Va. Apr. 17, 2021) (analyzing how a hearing panel made credibility judgments in favor of a female and against a male). There are no such allegations in the complaint.

With respect to Gilliam, Coleman offers the conclusory allegation that Gilliam made a "credibility determination in favor of the female complainant." Compl. ¶ 292. This conclusory allegation is not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 681. Furthermore, the facts alleged in the complaint do not support this conclusory allegation.

There is no indication that Gilliam knew Doe, spoke with Doe, or was involved in the Title IX investigation other than as Coleman's supervisor.

Compl. ¶¶ 69, 273. Thus, there are no allegations to show that Gilliam gave more weight to Doe's statements than Coleman's.

To the extent, Coleman claims that his termination as Provost shows that Gilliam gave more weight to Doe's version of events than his. This argument fails.

Coleman was not terminated from his Provost position because of the Title IX investigation, he was terminated because his behavior "did not meet the expectations of senior leaders." Compl. ¶ 93. Further, Coleman was allowed to continue working at the University as a tenured professor. Compl. ¶ 208. It would seem that if Gilliam was truly giving weight to Doe's account over Coleman's he would have required Coleman to take some type of training about sexual harassment to protect the University in the future. However, there are no allegations that Coleman was required to engage in any type of training to retain his professorship. As a result, Coleman has not alleged that Gilliam gave more weight to Doe's version of events than his.

With respect to UNC Greensboro, Coleman claims that the University was indifferent to his concerns about anti-male bias and that Title IX investigator Muphie Chappell's prior work on behalf of female Title IX complainants biased her against males. Compl. ¶ 292. The factual allegations in the complaint do not support these assertions.

Coleman's claim that Chappell and UNC Greensboro were indifferent to his concerns about anti-male bias is based on the response to his lawyer's January 7, 2021 letter. This letter does raise procedural concerns, but it does not say anything about anti-male bias. Compl. Ex. U, ECF No. 1-22. Thus, the response to this letter does note demonstrate that Chappell or UNC Greensboro were indifferent towards concerns about anti-male bias.

In addition, Coleman's argument that Chappell's work has biased her against males is based on an assumption that the facts of the complaint do not support: that the only victims that Chappell works with are female. Coleman's complaint alleges that Chappell represented victims of sexual assault and works with victims of violence at UNC Greensboro. Compl. ¶¶ 123-24. Yet, there is no indication that Chappell works only with female and not male victims. As a result, Coleman has failed to allege that Chappell's prior work biased her against Coleman.

For these reasons, Coleman's sex discrimination claim is unsuccessful.

## III. Coleman's official capacity claims against Gilliam under section 1983 fail because *Ex Parte Young* is inapplicable.

Coleman asserts two official capacity claims under section 1983 against Gilliam: One based on due process and the other based on equal protection. Both claims fail.

As explained in *Ex Parte Young*, Coleman can assert a section 1983 claim against Gilliam in his official capacity if "(1) the violation for which relief is sought is an ongoing one, and (2) the relief sought is only prospective." *Republic of Paraguay v. Allen*, 134 F.3d 622, 627 (4th Cir. 1998) (analyzing the *Ex Parte Young* decision).[3] The face of the complaint reveals that neither part of this exception applies.

First, the complaint fails to identify the prospective or injunctive relief that Coleman is requesting. *See* Compl. ¶¶ 306-347; prayer for relief. Instead, the complaint merely provides the conclusory statement that Plaintiff is bringing a cause of action for prospective or injunctive relief. *See* Compl. ¶ 314.

Second, the violations for which Coleman seeks relief are not ongoing. Under his due process claim, Coleman identifies the harm as his termination and termination announcement. Compl. ¶ 318. Coleman has already been terminated and the termination announcement has already been issued.[4] Thus, the violation has occurred—it is not ongoing.

---

[3] Colman must rely on *Ex Parte Young* to state a claim because individuals sued in their official capacity are not considered "persons" under section 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).

[4] The fact that Coleman is seeking monetary damages for this injury in his prayer for relief supports this point.

Under his equal protection claim, Coleman identifies the harm as the Title IX investigation. Compl. ¶¶ 343, 346. However, the Title IX investigation is over. UNC Greensboro has dismissed the complaint. Compl. ¶ 346. Thus, this violation is not ongoing.

For these reasons, the *Ex Parte Young* exception is inapplicable. As a result, Coleman's section 1983 claims against Gilliam in his official capacity should be dismissed.

## IV. Coleman's claim against Gilliam for a due process violation fails because he has not alleged that Gilliam's conduct affected a protected liberty interest.

Coleman claims that Gilliam deprived him of his liberty interest in his good name and reputation without due process. Compl. ¶ 317. This claim fails for two reasons.

First, the Termination Announcement, which Coleman claims affected his liberty interest, does not imply that Coleman is dishonest or immoral. Thus, Gilliam did not take any action that affects Coleman's liberty interest in his good name.

Second, even if Gilliam had made a statement that affected Coleman's liberty interest, Coleman's claim would still fail because he did not request a name-clearing hearing.

As a result, Coleman's due process claim against Gilliam should be dismissed.

### A. Coleman has not sufficiently alleged that the termination announcement affected his liberty interest in his name because the announcement does not accuse him of dishonesty or immorality.

Statements that affect a protected liberty interest are statements that imply "the existence of serious character defects" like "dishonesty or immorality." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 308 (4th Cir. 2006) (quoting *Robertson v. Rogers,* 679 F.2d 1090, 1092 (4th Cir. 1982)).

The relevant statement here is: "UNC Greensboro today announced that it has **removed Jim Coleman** from the office of Provost **due to behavior that did not meet expectations for senior leaders at UNCG**." Compl. ¶ 93. Nowhere in the complaint does Coleman allege that this termination announcement accused him of dishonesty or immorality. *See* Compl. ¶¶ 306-31.

Coleman's termination announcement is more akin to a termination announcement that implies incompetence, which does not implicate a protected liberty interest for two reasons. *See Ridpath*, 447 F.3d at 308-09 (comparing cases that implicate a liberty interest with those that do not).

First, the termination announcement goes on to state that Coleman "will retain his faculty position in the Department of Biology." Compl. Ex. H at 2, ECF No. 1-9. It seems highly unlikely that UNC Greensboro would allow Coleman to retain his tenured professorship if the behavior in question was dishonest or immoral.

Second, according to the Complaint, at least one other person understood the termination announcement to imply that Coleman was not good at his job. Specifically, someone on Twitter noted that when it is announced that an administrator is returning to teaching "it's code for 'they were a bad administrator and we couldn't fire them as a faculty member.'" Compl. ¶ 102.

As a result, Coleman's claim fails because he has not identified a protected liberty interest. At most, the termination announcement implies he is incompetent, which does not affect a liberty interest

**B. Even if the termination announcement affected a liberty interest, Coleman's claim would still fail because he did not request a name-clearing hearing.**

Even if Coleman had identified a protected liberty interest, his claim would still fail because he did not request a name-clearing hearing.

As Coleman acknowledged in his complaint, if the termination announcement implicates a liberty interest, then he is entitled to a name-

clearing hearing. Compl. ¶ 316. However, according to *Bledsoe v. City of Horn Lake, Mississippi*, the case Coleman cites to support his claim, an employee must request a name-clearing hearing. 449 F.3d 650, 653 (5th Cir. 2006) ("[Plaintiff's] undisputed failure to request a hearing defeats his liberty interest claim"); *see also* Compl. ¶ 316 n.93.

Here, there are no allegations that Coleman requested a name-clearing hearing or made any request that could plausibly be construed as a request for a name-clearing hearing. *See* Compl. ¶¶ 306-31. This failure is particularly confusing because Coleman's lawyer—who cited the *Bledsoe* case—received a draft of the termination announcement before it was issued. Compl. Ex. F & G, ECF Nos. 1-7 & 1-8.

As a result, Coleman's failure to request a name-clearing hearing defeats his due process claim.

For these reasons, the due process claim should be dismissed.

## V. Coleman's claim against Gilliam for violating the equal protection clause fails because Coleman was not treated differently from a similarly situated individual or purposefully discriminated against.

To succeed on his equal protection claim under section 1983, Coleman must allege that he was "treated differently from others with whom" he is similarly situated "and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d

648, 654 (4th Cir. 2001). Coleman has not alleged facts to support either part of this test.

First, Coleman who was the Provost and Executive Vice Chancellor, which is a leadership position reporting directly to the Chancellor, is not similarly situated with a tenured theatre professor who has no leadership role.

Second, Coleman has not alleged that Gilliam engaged in any conduct that demonstrates intentional or purposeful discrimination. Thus, as explained below, Coleman's equal protection claim against Gilliam should be dismissed.

### A. A provost is not similarly situated with a tenured theatre professor.

According to the complaint, UNC Greensboro treats female employees accused of sexual misconduct more favorably than Coleman, a male. Compl. ¶¶ 226-47. To support this assertion, Coleman including allegations regarding UNG Greensboro's response to allegations of abuse made by former students against a tenured theatre professor. Compl. ¶¶ 226, 232, 233.

Coleman's argument demonstrates that he and the tenured professor are not similarly situated. In fact, another district court has held that when individuals hold different positions, they are not similarly situated. *See*

*Walls v. Pitt Cty. Sch. Bd. of Educ.*, No. 4:13-CV-104-D, 2015 WL 4994259, at *6 (E.D.N.C. Aug. 19, 2015).

This is precisely the case here. Coleman was the Provost, which is the second most senior administrator at the University. His direct supervisor was the Chancellor. Compl. Ex. A at 3; ECF 1-1. The tenured professor had no administrative responsibilities and reported to her school director, not the Chancellor. Thus, Coleman has failed to allege facts to support his assertion that he and the tenured professor are similarly situated. *See Walls*, No. 4:13-CV-104-D, 2015 WL 4994259, at *6.

### B. Coleman has not alleged any intentional discriminatory conduct by Gilliam.

Under *Iqbal*, Coleman must "plead that [Gilliam], through [his] own individual actions, has violated the Constitution." 556 U.S. at 676. Coleman has not done this.

Coleman makes the conclusory[5] assertion in his complaint that Gilliam "intentionally authorized and perpetrated a sexually biased and discriminatory Title IX investigation." Compl. ¶ 343. The facts do not support this assertion.

---

5 Conclusory allegations are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 681.

According to the Title IX Policy attached as Exhibit S to the complaint, when a formal complaint is filed with the Title IX office, the office *must* investigate to determine if the claim needs to be dismissed or proceed to a full hearing. Compl. Ex. S at 7-10, ECF No. 1-20; *see also* Compl. ¶ 48. Thus, the complaint initiates the investigation, not any action by Gilliam.

Furthermore, it is up to the Title IX coordinator to decide whether to dismiss the complaint. Compl. ¶ Ex. S at 7-8. Coleman admits that Murphie Chappell is the Title IX coordinator.[6] Compl. ¶ 121. As a result, Coleman has not alleged any facts to support his assertion that Gilliam intentionally discriminated against him by authorizing a Title IX investigation. *See Morrison*, 239 F.3d at 654.

For these reasons, Coleman's equal protection claim should be dismissed.

## VI. Gilliam is entitled to qualified immunity because Coleman has not alleged a violation of federal law or that any legal principal was clearly established at the time Gilliam allegedly violated the law.

At the pleading stage, qualified immunity bars individual capacity claims unless (1) the complaint plausibly alleges a violation of federal law,

---

6 Coleman cannot rely on conduct by Gilliam's subordinates to remedy this pleading failure. This is because allegations that a supervisor "'knew or should have known' about their subordinates' conduct" is insufficient. *Evans v. Chalmers*, 703 F.3d 636, 661 (4th Cir. 2012).

and (2) the legal principle at issue is clearly established. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 741 (2011). Neither of these elements are present here.

As explained above, Coleman has not plausibly alleged a violation of federal law. Specifically regarding his equal-protection claim, Coleman has failed to allege that Gilliam treated him differently from a similarly situated individual or that he intentionally discriminated against him by authorizing a Title IX investigation. *See* supra V.

In addition, Coleman has not plausibly alleged his due process claim. He has failed to allege that the termination announcement implies that he is dishonest or immoral, which is necessary for the announcement to affect his liberty interest in his name. *See* supra IV(A). In addition, Coleman failed to request a name-clearing hearing, which is necessary when a termination announcement affects a liberty interest. *See* supra IV(B).

Even if Coleman had alleged a plausible claim for relief, the legal principles at issue are not clearly established. A legal principle is clearly established if, at the time of the defendant's challenged conduct the principle is clear enough "that every 'reasonable official would have understood that what he is doing violates'" that principle. *al-Kidd*, 563 U.S. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In other words, "qualified immunity affords protection to an officer who takes an action that is not

clearly forbidden—even if the action is later deemed wrongful." *Rogers v. Pendleton*, 249 F.3d 279, 286 (4th Cir. 2001).

Here, the relevant legal questions are:

- Was it clearly established, under the circumstances faced by Gilliam, that allowing an "unlawful and biased Title IX investigation" would impermissibly interfere with Coleman's liberty interest in his good name and reputation? Compl. ¶ 326; *see also* Compl. ¶¶ 316-17.

- Was it clearly established, under the circumstances faced by Gilliam, that investigating a claim of sexual harassment by a female employee against a male employee was "sexually biased and discriminatory"? Compl. ¶ 343.

As explained below, the answer to both questions is no.

Again, as previously discussed, case law clearly establishes that a termination announcement can affect an employee's liberty interest in his good name and reputation if it implies "the existence of serious character defects" like "dishonesty or immorality." *Ridpath*, 447 F.3d at 308 (quoting *Robertson,* 679 F.2d at 1092) (discussing the liberty interest in the context of the Fourteenth Amendment Due Process Clause). There is no similar case law for Title IX investigations. As a result, it is not clearly established that a Title IX investigation affects an employee's liberty interest in his good name.

In addition, case law does not clearly establish that investigating a claim of sexual harassment by a female against a male is sexually biased and discriminatory. Rather, case law prohibits a person's sex from being the but-

for cause of the investigation. *See* supra II. In other words, the investigation must have been so tainted by anti-male bias that the only reasonable inference is that sex was the but-for factor in the investigation. *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 236 (4th Cir. 2021).

Here, the facts do not support the inference that Coleman's sex was the cause of the investigation. Coleman's complaint acknowledges that the text messages can be read to create a "distorted factual narrative." Compl. ¶ 60. This implies that the text messages can be read to support a Title IX investigation regardless of Coleman's sex. Further, Gilliam has not treated him differently from similarly situated individuals.

For these reasons, Gilliam is entitled to qualified immunity.

## VII. Coleman's claim for obstruction of justice fails because he has not alleged that Gilliam's conduct adversely affected his ability to obtain a legal remedy.

In North Carolina, civil obstruction of justice occurs when a defendant takes intentional action "for the purpose of obstructing, impeding, or hindering the plaintiff's ability to seek and obtain a legal remedy." *Blackburn v. Carbone*, 208 N.C. App. 519, 527, 703 S.E.2d 788, 795 (2010). In addition, generally for the plaintiff to prevail, he must show that the defendants conduct "adversely impacted" his ability to seek a remedy. *Broughton v. McClatchy Newspapers, Inc.*, 161 N.C. App. 20, 33, 588 S.E.2d 20, 30 (2003).

Here, Coleman has neither alleged any intentional action by Gilliam to obstruct his ability to seek a legal remedy nor has he alleged Gilliam's conduct adversely affected his ability to seek a legal remedy.

Coleman argument appears to be that Gilliam's termination of Coleman was the de facto resolution of the Title IX investigation and thereby tainted the entire Title IX process. *See* Compl. ¶¶ 356-57. The facts do not support this narrative. The termination announcement does not reference Title IX or sexual harassment. *See* Compl. Ex. H. Furthermore, there is no indication that Coleman's termination as Provost was for the purpose of interfering with the Title IX investigation. As the termination announcement states, Coleman was terminated "due to behavior that did not meet expectations for senior leaders at UNCG." Compl. Ex. H.

Additionally, any conduct by Gilliam did not adversely impact Coleman's ability to seek a remedy. The Title IX complaint was ultimately dismissed. Compl. ¶ 359.

For these reasons, Coleman's claim for obstruction of justice should be dismissed.

## Conclusion

For these reasons, Coleman's complaint should be dismissed.

This 19th day of November, 2021.

JOSHUA H. STEIN
Attorney General

/s/ Kenzie M. Rakes
Kenzie M. Rakes
Assistant Attorney General
NC State Bar No. 46349
krakes@ncdoj.gov

/s/ Zach Padget
Zach Padget
Assistant Attorney General
NC State Bar No. 46610
zpadget@ncdoj.gov

North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
Tel: 919-716-6920
Fax: 919-716-6764

*Attorneys for Defendants*

UNIVERSITY OF NORTH CAROLINA

_/s/ Laura E. Dean_
Laura E. Dean
NC State Bar No. 43775
ledean@northcarolina.edu

P.O. Box 2688
Chapel Hill, North Carolina 27515-2688
Tel: 919-962-4551

*Attorneys for Defendant University of North Carolina at Greensboro*

**CERTIFICATE OF COMPLIANCE**

I certify that, in accordance with Rule 7.3(d)(1) of the Local Civil Rules of Practice and Procedure, the attached brief (excluding the parts excluded by rule) contains fewer than 6250 words.

This 19th day of November, 2021.

/s/ Zach Padget
Zach Padget
Assistant Attorney General

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing **BRIEF IN SUPPORT OF DEFENDANTS THE UNIVERSITY OF NORTH CAROLINA AT GREENSBORO AND DR. FRANKLIN D. GILLIAM, JR.'S MOTION TO DISMISS** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all registered CM/ECF users, including Plaintiff's counsel, Randolph M. James (rmjames@rmjameslaw.com).

This 19th day of November, 2021.

/s/ Zach Padget
Zach Padget
Assistant Attorney General